AMTROL, INC., Plaintiff,

v.

**VENT–RITE VALVE CORP.,**
**Emerson-Swan, Inc., and**
**Flamco, bv, Defendants.**

**Civ. A. No. 85–0681–Y.**

United States District Court,
D. Massachusetts.

May 19, 1986.

Paul R. Gupta, Sherin and Lodgen, Boston, Mass., Michael S. Belohlavek, Marie V. Driscoll, Marla G. Simpson, Townley and Updike, New York City, Tom M. Schaumberg, Plaia & Schaumberg, Chartered, Washington, D.C., for plaintiffs.

Terrence Leahy, Bruce D. Sokler, Jeffrey S. Robbins, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, Boston, Mass., for defendants.

James F. Kavanaugh, Michael R. Godfried, Burns & Levinson, Boston, Mass., Michael L. Martell, Barry G. Magidoff, Abberley, Kooiman, Marcellino and Clay, New York City, for defendant FLAMCO.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

This is a dispute between participants in the plumbing and heating equipment industry. The plaintiff Amtrol, Inc. ("Amtrol") is a Rhode Island corporation engaged in the manufacture and distribution of various plumbing and heating products, including pre-pressurized expansion tanks and well tanks. The defendant Emerson-Swan, Inc. ("Emerson") is a Massachusetts corporation which serves as a manufacturer's representative in the plumbing and heating equipment industry. Emerson distributes, among other things, private label expansion tanks manufactured by others. The defendant Vent-Rite Valve Corporation ("Vent-Rite") is a Massachusetts corporation which manufactures steam and heat hot water valves. The same shareholders own Emerson and Vent-Rite, and throughout this opinion they will sometimes be referred to jointly as Emerson. The defendant Flamco, bv ("Flamco") is a Dutch corporation with its principal place of business in Holland. Flamco manufactures plumbing and heating equipment, including expansion tanks and well tanks. In 1984, Vent-Rite began to import expansion tanks which were manufactured in the Netherlands by Flamco. The imported tanks were distributed by Emerson in the New England states and New York.

On March 4, 1985 Amtrol filed a 32 count amended complaint in this Court alleging a variety of state and federal claims sounding in antitrust, trademark infringement, and unfair competition.[1] Emerson and Vent-Rite answered by way of denial, and asserted an eight count counterclaim against Amtrol. Flamco did not answer Amtrol's complaint, but instead moved to dismiss for lack of personal jurisdiction. Count II of Emerson's counterclaim alleges that Amtrol violated § 2 of the Sherman Act, 15 U.S.C. § 2, by monopolizing or attempting to monopolize the well tank market in the relevant geographic markets. Amtrol has moved to dismiss Count II of the counterclaim. Both motions are now before the Court, and they will be addressed in turn.

### I. Personal Jurisdiction Over Flamco

■ This Court recently set forth the two step inquiry in which a court must engage to determine if it has jurisdiction over a nonresident defendant:

(1) Is the court authorized by either a federal or state statute to exercise jurisdiction? (2) Even if there is statutory authorization, does the defendant have the requisite minimum contacts with the jurisdiction so that the exercise of personal jurisdiction will comport with due process?

*Buckeye Associates Ltd. v. Fila Sports, Inc.*, 616 F.Supp. 1434, 1437 (D.Mass.1985) (hereinafter "Buckeye"). Because Count I of Amtrol's complaint alleges a violation of the federal antitrust laws, Amtrol argues that the first part of the jurisdictional inquiry is satisfied by § 12 of the Clayton Act. The Court agrees.

Section 12 provides that:

---

1. Pursuant to a settlement agreement between the parties 17 of the original counts have been dismissed. The remaining counts sound only in antitrust and unfair competition.

Any suit, action or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 12. By its terms, § 12 allows for worldwide service of process. Thus, the service upon Flamco in Holland was "effective" within the meaning of Rule 4(f) of the Federal Rules of Civil Procedure.[2] Effective service of process is the "vehicle by which the court may obtain jurisdiction." *Aro Manufacturing Co. v. Automobile Body Research Corp.*, 352 F.2d 400, 402 (1st Cir.1965). Accordingly, whether this Court properly may exercise jurisdiction over Flamco, at least as to Count I, depends on whether maintenance of the suit comports with due process. *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); *Insurance Corporation of Ireland, Ltd. v. Compagnie des Bauxite de Guinee*, 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982).

The due process concerns implicated in a federal question case are those of the Fifth Amendment rather than the Fourteenth Amendment. *Stanley Works v. Globemaster, Inc.*, 400 F.Supp. 1325, 1334 n. 13 (D.Mass.1975). In *Buckeye* this Court recognized that "as a general proposition, the Fifth Amendment would permit a federal court to exercise personal jurisdiction over a defendant in a federal question case by looking to the defendant's aggregate contacts with the United States as a whole, without regard to the defendant's contacts with the forum state." *Buckeye* at 1438 n. 5. The Court went on to suggest, in dictum, that notwithstanding the latitude allowed by the Fifth Amendment the "better rule" in antitrust cases would be to analyze

personal jurisdiction with reference to the state long arm statute. *Id.* at 1438 n. 5. Upon further consideration, the Court is of the view that its suggested "better rule" is not in keeping with the established law of this circuit. Instead, the Court holds that where jurisdiction is authorized by the Clayton Act, due process is satisfied when the defendant has the requisite minimum contacts with the United States as a whole.

In *Driver v. Helms*, 577 F.2d 147 (1st Cir.1978); *rev'd on other grounds sub. nom., Stafford v. Briggs*, 444 U.S. 527, 100 S.Ct. 774, 63 L.Ed.2d 1 (1980), the defendants were served pursuant to the nationwide service of process provision of 28 U.S.C. § 1391(c). The defendants argued, and the court assumed, that they lacked minimum contacts with Rhode Island, the forum state. Nonetheless, the court rejected the argument that the exercise of personal jurisdiction over the defendants violated due process. The court noted that Congress' jurisdiction was over the entire United States, and that the limitations imposed by the due process clause of the Fifth Amendment are "not related to state boundaries." *Id.* at 157. The minimum contacts analysis, which was developed to test the limits of state court jurisdiction, was not relevant because nationwide service of process "is not extraterritorial for a court of the United States." *Id.* at 157.

The First Circuit reaffirmed the holding of *Driver* in *Johnson Creative Arts v. Wool Masters*, 743 F.2d 947 (1st Cir.1984). There the plaintiff brought suit in Massachusetts to enjoin trademark violations under 15 U.S.C. § 1125(a). In appealing a district court dismissal of two New York defendants for improper venue, the plaintiff argued that "the test for 'doing business' under the venue statute should be the same as for determining whether a corporation is amenable to service of process." *Id.* at 949. The Court of Appeals disa-

---

**2.** Rule 4(f) provides that, unless authorized by a United States statute or "by these rules," service of process in federal court cases is effective only within the territorial limits of the state in which the district court sits. The "by these rules"

language refers to Rule 4(e)(2) which authorizes extraterritorial service "under the circumstances and in the manner" prescribed by the long arm statute of the forum state.

greed. In explaining why it was unwilling to equate amenability to suit with proper venue, the court noted that "due process would allow a federal court in a federal question case to issue service of process nationwide, and does not require that [the defendant] have any contact with a particular district in order to be sued there." *Id.* at 950.

■ From these and other cases, *see e.g., Stafford v. Briggs, supra* at 554, 100 S.Ct. at 789 (Stewart, J. dissenting) ("due process requires only certain minimum contacts between the defendant and the sovereign that has created the court"), it appears that it is the law in this circuit that where a defendant is served pursuant to a congressional authorization of worldwide service of process, due process requires only that the defendant's aggregate contacts with the United States as a whole are such that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe v. Washington, supra* at 316, 66 S.Ct. at 158.[3] Thus, Flamco is correct in asserting that the extraterritorial service in this case must be tested against the familiar "minimum contacts" analysis. However, the relevant forum is not Massachusetts, but rather the entire United States.

The affidavits and depositions now before the Court evidence a systematic pattern of contacts between Flamco and the United States. Since 1979, Flamco has succeeded in cultivating three corporate customers in the United States; Krueger Manufacturing Co. of Arizona ("Krueger"), Flair Manufacturing Corp. of New York ("Flair"), and Vent-Rite of Massachusetts.

Flamco's relationship with Krueger arose out of a September, 1982 trip to the United States by Flamco's export manager, Frank Cherry. During the five week period of that trip Cherry based his sales activities out of Houston. He spent three of those weekends at Krueger's facilities in Tucson, Arizona. During one of those weekends Cherry used Krueger's facilities to meet with 180 manufacturing agents from all over the country.

In December, 1982, Cherry returned to Tucson with Cornelius Nobel, Flamco's managing director, to negotiate a letter of intent between Flamco and Krueger. This letter of intent was signed by Cherry and a Krueger representative at a trade show in Atlantic City, New Jersey in January, 1983. The document indicated an intention to make Krueger the sole United States distributor of Flamco's pipe hanger system.

Although it appears that Flamco did not profit from its relationship with Krueger (Flamco alleges $50,000 in sales to Krueger against $65,000 in marketing costs), this certainly was not for lack of trying. In September, 1983, Cherry arrived in Tucson for what would end up being a year long stay. While there he had business cards printed which identified him as Flamco's export manager and gave a Tucson address. Cherry's primary mission in Tucson was to give technical assistance to Krueger. While there he also solicited more pipe hanger business for Flamco at trade shows in Los Angeles and San Francisco.

The record is less clear concerning Flamco's relationship with Flair. It appears that from 1980 to 1984 Flamco sold approximately $18,000 worth of expansion tanks to Flair. It is difficult to determine on this record the quantity or quality of Flamco's contacts with the United States with respect to the Flair sales.

Flamco's relationship with Emerson began with a telephone conversation between Flamco and Emerson representatives in March, 1984. As a result of that conversation, representatives of Flamco and Emerson met at a trade fair in England. In the wake of the meeting, Nobel and Cherry began to cultivate Emerson as a customer of its pipe hangers and expansion tanks. Through the fall of 1984, Flamco representatives sent at least seven letters to Emerson in Massachusetts exploring possible sales arrangements, including a joint ven-

---

**3.** Of course, due process also entails certain notice requirements. But there is no suggestion in this case that notice to Flamco was lacking in any way.

ture or an exclusive distributorship. During this same period, Cherry visited Emerson's Massachusetts headquarters three times. On the third visit, in August of 1984, Cherry was accompanied by Nobel. During these visits Cherry and Nobel negotiated sales of expansion tanks and offered technical assistance to the Emerson representatives. As a result of these discussions, and further telephoning and correspondence, Flamco sold approximately 70,000 expansion tanks to Emerson. The value of these sales was approximately $450,000.

■ This Court has previously articulated the now familiar "minimum contacts" standard established by *International Shoe* and its progeny, *see Beaver Builders v. Schnip Corp.*, 622 F.Supp. 1051, 1054–55 (D.Mass.1985), and there is no need to reiterate those standards here. Applying those due process standards to this case, the Court rules that Flamco has purposefully availed itself of the privilege of conducting business within the United States, and that it should reasonably have anticipated being hailed into court here. The numerous instances of physical presence in the country, together with the continued efforts to develop a customer base in the United States for various Flamco products, compel the conclusion that maintenance of this suit does not offend any traditional notion of fairness. Both the quantity and the nature of Flamco's contacts with the United States justify the exercise of jurisdiction in this case.

Aside from the three customers discussed above, there is considerable evidence that Cherry and Nobel unsuccessfully solicited many other customers in the United States. Flamco argues that because it succeeded in procuring "only" three customers its contacts with the United States are *de minimus*. The Court disagrees. The record evidences a pattern of conduct aimed at exploiting the potential of the United States marketplace, including visits to numerous cities by Cherry and Nobel to explore marketing opportunities. The fact that Flamco was less successful

than it might have hoped does not limit the significance of these visits. Similarly, it is unimportant that Flamco's United States sales might represent a small percentage of its worldwide revenues. Consideration of the relationship between Flamco's United States activities and its worldwide operations would inappropriately shift the focus of the jurisdictional inquiry away from Flamco's United States contacts.

■ Flamco argues strenuously that exercise of jurisdiction is improper because the remaining counts of the complaint do not "arise out of" its United States activities. In Flamco's view, all of the remaining counts relate to the pricing and distribution of the expansion tanks. Since Vent-Rite and Emerson have acknowledged that Flamco had no role in marketing the expansion tanks, Flamco concludes that jurisdiction does not exist. This argument confuses lack of jurisdiction with a defense on the merits. In essence, Flamco is saying, "we had nothing to do with all this." If that is so, it will be reflected at the liability stage. But an alleged conspirator can hardly rely on the affidavits of alleged co-conspirators to defeat jurisdiction. It is enough at this stage that Amtrol can demonstrate that conversations and negotiations relating to the product took place in the United States. Whether Flamco violated the Sherman Act remains to be seen. In addition, it is proper for the Court to consider the unrelated pipe hanger sales in determining the continuous nature of Flamco's business activities. *Helicopteros Nacionales de Columbia v. Hall*, 466 U.S. 408, 415–16, 104 S.Ct. 1868, 1873–74, 80 L.Ed.2d 404 (1984).

Having determined that it has jurisdiction over Flamco with respect to the Sherman Act claim, the Court is left with this thorny question: When a federal district court obtains jurisdiction over a nonresident defendant pursuant to the extraterritorial service provision of a federal statute, does Rule 4(f) require there be an independent basis of jurisdiction over the defendant with respect to additional state claims? This is a question that has caused disagreement not only among the courts of this

nation, but among the judges in this district. *Cf. Wilensky v. Standard Beryllium Corp.*, 228 F.Supp. 703, 706 (D.Mass. 1964) (Caffrey, J.); *with S–G Securities, Inc. v. Fuqua Investment Co.*, 466 F.Supp. 1114, 1123 (D.Mass.1978) (Skinner, J.). Neither the United States Supreme Court nor the First Circuit has yet addressed this issue.[4] Nonetheless, there is a clearly discernible trend among the modern federal cases to allow pendent *personal* jurisdiction in those circumstances where a court has pendent *subject matter* jurisdiction. *See generally* 4 Wright & Miller, *Federal Practice and Procedure* § 1125 (and cases cited therein).

Any inquiry into pendent personal jurisdiction must begin with an examination of the seminal pendent subject matter jurisdiction case, *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (hereinafter "Gibbs"). In that case the plaintiff brought suit under § 303 of the Taft-Hartley Act, alleging that the union had engaged in a secondary boycott. He also made a claim under state law for conspiracy to interfere with an employment relationship. At trial he lost on his federal claim, but prevailed on the state claim. On appeal the question arose whether the federal court had jurisdiction to adjudicate the state claim. In holding that it did, the Supreme Court announced a two part analysis for questions of subject matter jurisdiction: First, does the court have the "power" to hear the state claims. Second, should the court in the exercise of sound discretion elect to hear the state claim. The judicial "power" to hear pendent state claims exists whenever "the relationship between [the federal] claim and the state claims permits the conclusion that the entire action before the court comprises but one constitutional 'case.'" *Id.* at 725, 86 S.Ct. at 1138. That conclusion is reached when the state and federal claims "derive from a common nucleus of operative fact."

*Id.* at 725, 86 S.Ct. at 1138. Once power is established the court must direct itself to "considerations of judicial economy, convenience and fairness to litigants." *Id.* at 726, 86 S.Ct. at 1139. If the court, in its discretion, finds these justifications lacking in a particular case it can decline to exercise jurisdiction over the pendent state claims. As announced in *Gibbs*, "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." *Id.* at 726, 86 S.Ct. at 1139 (footnote omitted).

Since *Gibbs*, almost all the courts which have considered whether Rule 4(f) allows for pendent personal jurisdiction have analyzed the problem in terms of the framework established by *Gibbs* for pendent subject matter jurisdiction. *See e.g., S–G Securities, Inc. v. Fuqua Investment Co.*, supra; *Bertozzi v. King Louie International, Inc.*, 420 F.Supp. 1166, 1172 (D.R.I. 1976); *International Controls Corp. v. Vesco*, 593 F.2d 166, 175 n. 5 (2nd Cir.), cert. denied, 442 U.S. 941, 99 S.Ct. 2884, 61 L.Ed.2d 311 (1979); *Piper Acceptance Corp. v. Slaughter*, 600 F.Supp. 169, 171–72 (D.Colo.1985). The Third Circuit is one of the few courts to have discussed the problem at length. In *Robinson v. Penn Central Co.*, 484 F.2d 553 (3rd Cir.1976), the defendant appealed denial of his motion to dismiss the pendent state claims for insufficient service of process. Service on the federal claim had been made pursuant to the Securities Exchange Act of 1934 which, like the Clayton Act, provides for service of process wherever the defendant may be found. 15 U.S.C. § 78aa. The court began its analysis of pendent personal jurisdiction by noting that the issue "is primarily a matter of interpretation of Rule 4(f), since it is not disputed that Congress could constitutionally expand the service of process of federal district courts throughout the United States," *id.* at 554 (citations omitted). In view of the wide area of effective service allowed by the Securities

---

**4.** In *Moreno v. United States*, 120 F.2d 128 (1st Cir.1941), the First Circuit held that a plaintiff could not rely on the extraterritorial service provision of a federal statute to assert an un-related state law claim against an impleaded third party defendant. The unique facts of that case distinguish it from the case at bar.

Exchange Act (through Rule 4[f]) the court had this to say about the proper focus of the analysis:

> Once the defendant is before the court, it matters little, from the point of view of procedural due process, that he has become subject to the court's ultimate jurisdiction as a result of territorial or extraterritorial process. Looked at from this standpoint, the issue is not one of territorial in personam jurisdiction—that has already been answered by the statute— but of subject matter jurisdiction. It is merely an aspect of the basic pendent jurisdiction problem.

*Id.* at 555. The court then went on to hold that the exercise of personal jurisdiction was appropriate on the facts of that case under the *Gibbs* standard.

Perhaps the most eloquent expression of the opposing viewpoint was put forward by Chief Judge Caffrey of this district. In the pre-*Gibbs* case of *Wilensky v. Standard Beryllium Corporation*, 228 F.Supp. 703 (D.Mass.1964), Judge Caffrey held that extraterritorial process made under a federal statute authorized jurisdiction only for the limited purpose of adjudicating the federal claim. *Id.* at 706. In his view, the pendent subject matter jurisdiction cases were off point because they involved an interpretation of 28 U.S.C. § 1331 in light of "considerations of convenience and economy of judicial administration." *Id.* at 705. He thought those considerations irrelevant when "faced with the express provision of federal law that unless otherwise provided by statute, service must be made within the territorial limits of the state in which the district court is held." *Id.* at 705 (citing Rule 4[f]). Judge Caffrey therefore reasoned that pendent personal jurisdiction was "expressly forbidd[en]" by Rule 4(f). *Id.* at 705.

■ As is true with most difficult issues, there are both strengths and weaknesses in the positions of courts on each side of this debate. At the heart of the matter, the question is whether in allowing for extraterritorial service Congress intended to give the court jurisdiction over the "claim" or the "case." There is little in the Clayton Act which suggests an answer to this question, other than the fact that Congress thought the potential for antitrust injury sufficiently widespread that it granted the federal courts in every district potential jurisdiction over an antitrust defendant. Nonetheless, this Court must acknowledge the virtual unanimity with which post-*Gibbs* courts have accepted the notion of pendent personal jurisdiction. While none of these cases directly control the decision here, *see Palandjian v. Pahlavi*, 782 F.2d 313, 314 (1st Cir.1986), the force of their numbers adds weight to the argument. Thus, this Court holds that where it obtains jurisdiction over a defendant pursuant to the extraterritorial service of process provision of the Clayton Act, it may, in its discretion, exercise jurisdiction over that defendant with respect to state law claims that arise out of a common nucleus of operative fact.

■ A rule allowing pendent personal jurisdiction recommends itself not only because it is in keeping with recent precedent, but also because it allows the court to consider the incremental invasion on individual liberty presented by the additional state claims. The *Gibbs* doctrine has always been discretionary in the context of subject matter jurisdiction. There is no reason it ought not be equally discretionary with regards to personal jurisdiction. In *Gibbs*, the Supreme Court said that fairness to the litigants should guide the court's discretion in deciding whether to exercise subject matter jurisdiction. Since "fairness" is at the heart of the inquiry into personal jurisdiction, *International Shoe v. Washington, supra* at 316, 66 S.Ct. at 158; *Keeton v. Hustler Magazine*, 465 U.S. 770, 775–76, 104 S.Ct. 1473, 1478–79, 79 L.Ed.2d 790 (1984), it surely is an appropriate consideration in determining whether to exercise pendent personal jurisdiction. Hence, when a court believes that the policies underlying *Gibbs* would not be served by exercising pendent personal jurisdiction, it should require that there exist an inde-

pendent basis of personal jurisdiction over additional state claims.[5]

Applying this analysis to the case at bar, the Court rules that this is an appropriate case for exercising pendent personal jurisdiction. The additional state claims here arise out of the same operative facts as the federal claim. The state claims simply are applications of different legal theories to the same conduct. As such, it does not appear that Flamco will incur any significant additional burden in defending the state law aspects of the case. The maintenance of the state law claims likely will not require significant additional discovery, nor significantly alter the conduct of the trial. Accordingly, this Court will exercise jurisdiction over Flamco with respect to all claims.

## II. Antitrust Standing

Amtrol's original allegations of monopolization have proved infectious. In Count II of their counterclaim Emerson and Vent-Rite allege that Amtrol has monopolized the well tank market in the relevant geographic markets.[6] Amtrol denies these allegations but adds that, even assuming their truth, Count II must be dismissed for lack of standing. Amtrol argues that because neither Emerson nor Vent-Rite[7] are participants in the well tank market they simply are not the type of plaintiffs for which a remedy is provided in Clayton Act §§ 4 and 16.[8] Emerson and Vent-Rite respond that they have taken sufficient steps in preparing to enter the well tank market that they properly can invoke the protections of the statute.

Section 4 of the Clayton Act promises treble damages and attorney's fees to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15. Despite the broad wording of the statute, it is well established that Congress' words are not to be taken literally, and that the statute does not provide a remedy to "every person tangentially affected by an antitrust violation." *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 477, 102 S.Ct. 2540, 2547, 73 L.Ed.2d 149 (1982). Under the rubric of "antitrust standing," the Supreme Court and the lower federal courts have developed a variety of doctrines aimed at limiting the universe of potential antitrust plaintiffs. While these courts do not always agree on the precise formulations of the controlling standards, it is common ground that the aim of the antitrust standing inquiry is to determine whether Congress intended to extend the statute's protection to the type of plaintiff before the court. *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 535–36, 103 S.Ct. 897, 907, 74 L.Ed.2d 723 (1983).

The standing question in this case is: Under what circumstances can a potential entrant to a market claim that monopoliza-

---

5. Admittedly, there is a potential for unfairness under the pendent personal jurisdiction doctrine in the event the federal claim is dismissed before trial. In that situation a defendant might be forced to defend diversity claims, or even other federal claims, for which no independent basis of personal jurisdiction exists. The potential unfairness can be avoided, however. Where a motion to dismiss for lack of personal jurisdiction is denied, the defendant may proceed to trial on the merits without waiving its rights. 5 Wright & Miller, *Federal Practice and Procedure* § 1351 (1969). Thus, a denial of the original motion to dismiss should normally be considered without prejudice to a motion for reconsideration in light of the changed circumstances.

6. The parties agree that well tanks and expansion tanks constitute separate product markets.

7. Actually, none of the parties go very far in distinguishing between Emerson and Vent-Rite. While the Court ultimately concludes that standing exists here, it admits that the common ownership of the two companies makes it very difficult to determine on which company's behalf certain actions were taken. Thus, it may well be that after clarification of the facts at trial it will appear that only one of the companies has standing. Accordingly, the Court's opinion will continue to refer to the companies jointly as "Emerson" from time to time.

8. In its brief Amtrol does not distinguish between the two sections. Because the Court rules that standing exists under § 4, it follows naturally that standing also exists under § 16, which does not limit its coverage to injuries to "business or property."

tion of that market has injured his "business or property" within the meaning of Clayton Act § 4? While the Court finds no First Circuit case directly on point, a number of the other Circuit Courts of Appeals have answered this question, and in doing so have reached substantially similar conclusions. Indeed, the parties do not seriously disagree over the proper standard to be applied here. In their briefs they cite many of the same cases, and often the same language. The dispute here is as to what result should obtain when the proper standard is applied to the facts of this case.

The standard most frequently used to determine whether a potential market entrant has standing under § 4 is the four part test of *Waldron v. British Petroleum Co.*, 231 F.Supp. 72 (S.D.N.Y.1964). Under that test the court looks for "varying combinations of the following typical elements:

1. The background and experience of plaintiff in his prospective business ...

2. Affirmative action on the part of plaintiff to engage in the proposed business ...

3. The ability of plaintiff to finance the business and the purchase of equipment and facilities necessary to engage in the business ...

4. The consumation of contracts by plaintiff ..."

*Id.* at 81–82; *accord Parks v. Watson*, 716 F.2d 646, 660 (9th Cir.1983); *Curtis v. Campbell Taggert, Inc.*, 687 F.2d 336, 338 (10th Cir.), *cert. denied*, 495 U.S. 1090, 103 S.Ct. 576, 74 L.Ed.2d 937 (1982); II P. Areeda and D. Turner, *Antitrust Law* ¶ 335c (1978). Other courts have reduced the four Waldron questions to two, asking only whether the plaintiff "intended" to enter the market and was "prepared to do so" in a reasonable amount of time. *Grip-Pak, Inc. v. Illinois Tool Works, Inc.*, 694 F.2d 466, 475 (7th Cir.1982), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2340, 77 L.Ed.2d 1317 (1983); *Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 987 (D.C.Cir.1977), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978). Still other courts, per-

haps wary of trying to develop a single rule to cover an infinite variety of claims, couch their decisions in the more generalized requirement that the plaintiff demonstrate something "beyond a hope or expectation" of entering the allegedly monopolized market. *Image and Sound Service v. Altec Service Corp.*, 148 F.Supp. 237, 239 (D.Mass.1956).

This Court need not overly concern itself with the subtle distinctions between these various formulations. Despite their linguistic differences, the formulations are but separate attempts to draw the very same line. At the core of the inquiry is the question whether the litigant is a serious potential competitor, distinguishable from the great horde of opportunists who "would've, could've, or might've." No mechanical formula, no matter how carefully crafted, can overcome the ultimately *ad hoc* nature of the antitrust standing inquiry. In the end, it is the facts peculiar to each case around which the determination will revolve.

■ Viewing the case at bar from this perspective, the following facts lead the Court to conclude that Emerson is a proper plaintiff to bring a claim for monopolization of the well tank market. To begin with, Emerson is a successful and experienced competitor in the plumbing and heating equipment industry. While well tanks admittedly represent a new product line for Emerson, its background in the industry, together with the access to customers and distribution chains that such background implies, certainly is relevant to an inquiry designed to find out if a party was "prepared" to enter a market.

Emerson's decision to add well tanks to its line of products dates back to 1982, when Emerson and G.F.C. Corporation reached a tentative agreement under which Emerson would market the G.F.C. line of well tanks. However, that agreement fell through when G.F.C. was purchased by another corporation. In 1984, Emerson began negotiations with Flamco concerning the importation of expansion tanks, well tanks, and air vents. Emerson and Flamco

developed a "plan" first to introduce the expansion tanks to the American market and then to follow up by introducing the well tanks. Emerson began its preliminary marketing efforts in connection with the well tanks in the fall of 1984. Between November, 1984 and February, 1985, Emerson contacted twenty potential customers to "gauge their reaction to the prospect of [a new] well tank." Beginning in February, 1985, Emerson personnel travelled to Holland to discuss modification of Flamco's tanks to serve the American market. In addition, representatives from the companies discussed various sales and marketing approaches.

Since the spring of 1985 Emerson has continued to take steps toward full participation in the well tank market.[9] The company has selected a name for its product, designed the coloring of the tank, designed the tank's packaging, and selected model numbers. The company has prepared and distributed 5,000 marketing brochures to current and potential customers. Emerson has opened a line of credit to be used in connection with its purchases of well tanks, and has begun to order and receive the well tanks. In May, 1985, Emerson ordered 75 well tanks from Flamco. In June, 1985, Emerson ordered 1500 more tanks. Emerson has delivered at least six of these tanks to a customer for marketing tests.

Taking into account all of the above conduct, the Court rules that Emerson's attempt to enter the well tank market is sufficiently advanced that it has standing to maintain an action alleging monopolization of that market.

Amtrol argues that the steps Emerson has taken towards the well tank market are "merely preparatory," and that the fact that Emerson has not sold a single well

tank is dispositive of the issue. Such argument misconceives the scope of the injuries the antitrust laws are designed to prevent. It is "as unlawful to prevent a person from engaging in a business as it is to drive him from it." Areeda and Turner, *supra* at ¶ 335c. To deny standing in this case would be, in effect, to announce a rule that requires virtually full participation in the relevant market. But the cases already cited, and the policies underlying the Sherman and Clayton Acts, make clear that a substantial likelihood of undertaking the claimed enterprise is enough.

Amtrol also argues that Emerson should be denied standing because its damages are too speculative. It is true that in antitrust law the standing and damage inquiries necessarily overlap, since both look for the existence of "antitrust injury." But it would be a mistake completely to collapse the two inquires, particularly at this early stage of the litigation. No doubt Emerson will face a substantial burden in trying to prove the damages it incurred with some degree of certainty. The Court is mindful that normal damage rules which are designed to compensate existing competitor enterprises might be of limited relevance in assessing the damage to a nascent enterprise. However, if the prohibition on excluding entry to markets is to have any substance at all, it must be that plaintiffs who have attempted to enter the market ought at least have the opportunity to prove damages. If the proof as to damages is insufficient, but the injury is clear, Clayton Act § 16 provides an alternative injunctive remedy to right the wrong.

In accordance with all that has just been said, Flamco's motion to dismiss for lack of personal jurisdiction, and Amtrol's motion

---

**9.** Although standing normally is determined with reference to the facts as they existed at the time the claim was filed, to ignore the subsequent facts in this case would be to elevate form over substance. Technically, the Court could dismiss the claim without prejudice and allow Emerson to amend the counterclaim in order to bring the subsequent facts before the Court. Since the motion is now before the Court and

the parties have ably argued their positions, justice allows consideration of all Emerson's actions without engaging in this procedural formality. In reaching this conclusion the Court notes that the standing question here is under the Clayton Act, and that Amtrol does not contest that the injury-in-fact requirement of Article III has been met.

to dismiss for lack of standing, are both DENIED.

SO ORDERED.