Anderson v. Century Products Co.       CV-95-349-SD  10/23/96 P
                UNITED STATES DISTRICT COURT FOR THE

                       DISTRICT OF NEW HAMPSHIRE


Dana Anderson

        v.                                      Civil No. 95-349-SD

Century Products Company



                              O R D E R


        This order addresses three motions now pending.  Defendant

Century Products Company moves for: (1) dismissal of the

complaint on the basis that the court lacks personal jurisdiction

over Century; (2) transfer of the action to the Northern District

of Ohio pursuant to the change of venue provision of 28 U.S.C. §

1404(a); and (3) dismissal of the entire complaint pursuant to

Rule 12(b)(6), Fed. R. Civ. P., for failure to state a claim upon

which relief can be granted.


                         Factual Background

        The events leading up to this controversy began in 1990 when

Dana Anderson, a New Hampshire resident, invented a foldable

infant stroller having a detachable seat which could be easily

transferred, without unstrapping the child, from the frame of the

stroller to a car, where it functioned as a child safety car

seat.  In mid-year of 1990, Anderson sent inquiry to the Ohio offices of Century, who was in the business of manufacturing and selling both infant car seats and infant strollers, to ascertain interest in his invention.  Century responded with a letter sent to Anderson's New Hampshire residence inviting him to submit for further consideration a description of his idea, along with materials, drawings, and/or samples, on condition, however, that he execute Century's Idea Submission Policy (ISP) form (Exhibit B attached to Motion to Dismiss].  The ISP form purported to "control the conditions under which ideas are submitted to [Century]."  In June of 1990, Anderson executed and returned the ISP form, along with drawings and a written description of his invention (Exhibit C).

One month later, Century sent word to Anderson that "after further consideration of your invention, it does not fit into our marketing plans at this time."  Here is the rub of the factual dispute between the parties.  Anderson alleges that, shortly after sending the rejection letter, Century began manufacturing and marketing an infant stroller substantially identical to Anderson's invention.  According to Anderson, Century used his idea without his knowledge and authority to develop this new line of infant strollers.  Century, however, denies using Anderson's idea, claiming independent development of similar products for

2

more than a decade before learning of Anderson and his idea.

By way of an eight-count complaint, Anderson brings action against Century. The basic harm for which Anderson seeks redress is Century's unpermitted and uncompensated use of his idea for the detachable infant seat. Plaintiff seeks redress under eight legal theories: breach of contract and unjust enrichment (Counts I and V); fraud (Count III); breach of fiduciary duties and misappropriation of confidential information (Counts II and IV); conversion (Count VI); violation of New Hampshire's Uniform Trade Secret Act (Count VII); and, finally, violation of New Hampshire's Consumer Protection Laws (Count VIII). Century responds with various motions which are the subject of this order.

## Discussion

### 1. Jurisdiction

Defendant's first motion urges dismissal on the ground that exercise of personal jurisdiction over Century by this court violates Century's due process rights.

#### a. Standard of Review

When personal jurisdiction is contested, the plaintiff bears the burden of demonstrating that jurisdiction over the defendant

3

is proper. Sawtelle v. Farrell, 70 F.3d 1381, 1387 (1st Cir. 1995). To carry the burden when, as in this case, there has been no evidentiary hearing, the plaintiff must make a prima facie showing of personal jurisdiction by offering "evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction." Boit v. Gar-Tec Products, Inc., 967 F.2d 671, 675 (1st Cir. 1992). In meeting this standard, the plaintiff "ordinarily cannot rest upon the pleadings, but is obliged to adduce evidence of specific facts." Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 145 (1st Cir. 1995); accord United Elec. Workers v. 163 Pleasant Street Corp., 987 F.2d 39, 44 (1st Cir. 1993). However, the court "must accept the plaintiff's (properly documented) evidentiary proffers as true" and make its ruling as a matter of law. Foster-Miller, Inc., supra, 46 F.3d at 145. An evidentiary hearing is required only if the court determines that it would be unfair to the defendant to resolve the issue without requiring more of the plaintiff than a prima facie showing of jurisdiction. Id. at 146.

    b. Analysis

When subject matter jurisdiction is premised on diversity, a federal court may assert personal jurisdiction over a nonresident

4

defendant only if the plaintiff establishes both that: (1) the forum state's long-arm statute authorizes the exercise of jurisdiction over the defendant, and (2) the defendant has sufficient "minimum contacts" with the forum state such that the court's jurisdiction does not offend the defendant's due process rights. Sawtelle, supra, 70 F.3d at 1387; Kowalski v. Doherty, Wallace, Pillsbury & Murphy, 787 F.2d 7, 8 (1st Cir. 1986).


        c.   New Hampshire's Long-Arm Statute

Because Century is a foreign corporation, incorporated for profit under the laws of Ohio, New Hampshire Revised Statutes Annotated (RSA) § 293-A:15.10 (Supp. 1995) is the controlling long-arm statute. See McClary v. Erie Engine & Mfg. Co., 856 F. Supp. 52, 55 (D.N.H. 1994). The New Hampshire corporate long-arm statute has been interpreted "to authorize jurisdiction over foreign corporations to the full extent allowed by federal law." Id. Therefore, the statutory authority requirement for assertion of jurisdiction collapses into the "minimum contacts" analysis, and satisfaction of the latter renders jurisdiction proper under the New Hampshire long-arm statute.


        d.   Constitutional Analysis:  Due Process

When a court asserts personal jurisdiction over a defendant,

5

it is exercising power which, like all government exercises of power, is subject to constitutional limits. See Foster-Miller, Inc., supra, 46 F.3d at 143. Here, those limits stem from the Due Process Clause of the Fourteenth Amendment. See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 413-14 (1984) (citing Pennoyer v. Neff, 95 U.S. 714 (1877)). For the court to properly assert personal jurisdiction, the defendant must have had "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Helicopteros, supra, 466 U.S. at 414 (quoting International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)); accord Burnham v. Superior Court of Cal., County of Marin, 495 U.S. 604, 618 (1990). Minimum contacts analysis focuses on the expectations of the defendant requiring that his conduct bear such a "substantial connection with the forum [s]tate" that the defendant "should reasonably anticipate being haled into court there." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 473-75 (1985) (internal quotations omitted).

In this case, plaintiff alleges multiple causes of action, some sounding in tort and others in contract. Personal jurisdiction over the defendant must be proper for each and every cause of action in the complaint. Nelson v. R. Greenspan & Co., 613 F. Supp. 342, 346 (E.D. Mo. 1985); Debreceni v. Bru-Jell

6

Leasing Corp., 710 F. Supp. 15, 19 (D. Mass. 1989) ("Where one complaint contains two claims . . . there must be an independent basis for the assertion of personal jurisdiction for each claim. Jurisdiction over one claim does not imply jurisdiction over another."). "For purposes of jurisdictional disputes, each count must be considered as though it constituted a separate complaint." Jack O'Donnell Chevrolet, Inc. v. Shankles, 276 F. Supp. 998, 1002 (N.D. Ill. 1967). Jurisdiction for plaintiff's contract causes of action is more problematic, and the court will begin discussion there.

The First Circuit uses a three-part test to determine whether the defendant has had sufficient minimum contacts with the forum state to support personal jurisdiction:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

United Elec. Workers, supra, 960 F.2d at 1089; accord Sawtelle, supra, 70 F.3d at 1388.

The "relatedness" inquiry is whether plaintiff's claims arise out of, or relate to, defendant's New Hampshire activities. Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 206 (1st Cir.

7

1994). This requirement focuses on the causal nexus between the defendant's forum-based contacts and the injury underlying plaintiff's cause of action. Century's only relevant contact is the mailing of its ISP form to plaintiff's New Hampshire residence. The First Circuit has observed that the "transmission of information into [the forum] by way of . . . mail is unquestionably a contact for purposes of our analysis." Sawtelle, supra, 70 F.3d at 1381. But the issue is whether that contact is a sufficiently meaningful causative element of plaintiff's injury such that the two are "related."

The First Circuit recently addressed how tight the causal nexus must be to justify a finding of relatedness. Nowak v. Tak How Investments, Ltd., 94 F.3d 708, 712-16 Cir. 1996). The court made clear that, while obviously necessary, it is not enough that the contacts and the injury are linked together in a single causal chain, thereby being "but for" related; rather, the two links must be sufficiently close, and not too remote. However, the court left unclear how much more than "but for" causation is required. While indicating that proximate causation should be the benchmark, the court, nonetheless, went on to hold that relatedness could be found even where the contacts and the injury are not proximately situated in the causal chain. So, under Nowak, relatedness means a causal relation that lies somewhere in

8

between the "but for" and proximate standards.

In a case such as this, where the injury arises out of contract breach, proximate causation need not be demonstrated. If proximate causation were required, the following argument advanced by Century would have to be accepted as dispositive of the relatedness issue. For purposes of locating the direct cause of plaintiff's loss of contract rights, Century would distinguish between its New Hampshire contact of mailing the form and its activity at its Ohio offices which constitute contract breach. Mailing the form to a New Hampshire resident led directly to formation of contractual ties between the parties and thus directly caused the existence of rights in the plaintiff, but not their infringement. What directly caused infringement of plaintiff's rights, so the argument goes, was Century's activity that constituted contract breach, and that occurred at Century's Ohio offices, where it allegedly used plaintiff's idea without compensation or permission. Thus, the causal chain from Century's New Hampshire contacts to plaintiff's injury was severed by intervening causal forces, namely the Ohio breach activity, precluding a proximate cause relation between the contacts and the injury. If proximate causation is required, relatedness cannot be satisfied in a case such as this where breach occurs out of state.

9

There is some support for this view of relatedness.  See Kenney v. Hoover, 909 F. Supp. 34 (D. Mass. 1995) (holding that a Massachusetts federal court could not exercise jurisdiction over defendant because breach occurred in Maine).  However, this view goes against the great weight of authority holding that relatedness can be satisfied even if the acts constituting breach occurred outside the forum.  As the Second Circuit has noted, requiring that the acts of breach occur in the forum before relatedness is found may lead to the "unusual result that [a forum's courts] would have jurisdiction of only certain claims arising from the breach of an otherwise indivisible contract." Hoffritz For Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 59 (2d Cir. 1985).  The First Circuit, in Hahn v. Vermont Law School, 698 F.2d 48 (1st Cir. 1983), likewise refused to take so stringent a view of relatedness.  The Hahn court held that, on the facts of the case, relatedness was satisfied notwithstanding that the act of breach occurred outside the forum.  While Nowak directs proximate causation as the benchmark, Nowak, supra, 94 F.3d at 712-16, that standard cannot be required in a case such as this because, under Hahn, relatedness is met even if acts of breach occur outside the forum so long as defendant's in-forum activities are "instrumental in the formation of the contract." United Elec. Workers v. 163 Pleasant Street Corp., 960 F.2d 1080,

1089 (1st Cir. 1992).

Where, as here, the defendant sends a written offer into the forum with the intent that it be accepted and executed there, that forum contact is clearly instrumental in the formation of the contract. See Hahn, supra. Thus, under First Circuit caselaw, Hahn, supra, 698 F.2d at 50-52; Nowak, supra, 94 F.3d at 712-16, Century's New Hampshire contacts and the injury suffered are close enough on the causal chain to be related. As the first requirement of minimum contacts has been met, the court now turns its attention to the second.

Insofar as "[t]he function of the purposeful availment requirement is to assure that personal jurisdiction is not premised solely upon a defendant's 'random, isolated, or fortuitous' contacts with the forum state," Sawtelle, supra, 70 F.3d at 1391 (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1984)), "the cornerstones upon which the concept of purposeful availment rest are voluntariness and foreseeability." Id. (citing Ticketmaster, supra, 26 F.3d at 207). As such, the jurisdictional inquiry is not merely a quantitative arithmetic endeavor, but rather a qualitative one of weight and merit. Pritzker, supra, 42 F.3d at 61. One contact, if sufficiently meaningful, may be enough.

However, simply establishing a contact with the forum by

11

contracting with one of its residents, without more, does not necessarily satisfy the purposeful availment requirement. Whittaker Corp. v. United Aircraft Corp., 482 F.2d 1079, 1083-85 (1st Cir. 1973). Rather, the Supreme Court has directed courts to employ a "contract-plus" analysis. Burger King, supra, 471 U.S. at 479. According to the First Circuit, this involves evaluating "all of the communications and transactions between the parties, before, during, and after the consummation of the contract, to determine the degree and types of contacts the defendant has with the forum, apart from the contract alone." Ganis Corp. of California v. Jackson, 822 F.2d 194, 198 (1st Cir. 1987). Evaluation of these contacts must reveal a decision by the nonresident to interject himself into the local economy as a market participant. Bond Leather Co. v. Q.T. Shoe Mfg. Co., 764 F.2d 928, 933 (1st Cir. 1985)

Here, beyond the contract, there is minimal activity of Century indicating a decision to become a willing participant in the New Hampshire markets. By mailing the contract to plaintiff in New Hampshire, Century arguably was shopping in the New Hampshire market in intellectual property. It entered into a contractual arrangement to review plaintiff's idea for purposes of deciding whether or not to purchase it. Browsers are market participants no less than buyers.

12

However, there is no indication that Century regularly shopped in New Hampshire markets, nor that this incident was part of Century's general design to reap the fruits of these markets. Rather, the record indicates that this was an isolated occurrence, or one-stop shopping. The First Circuit has "evinced a special concern for formulating a jurisdictional rule that would protect wholly passive purchasers, who do no more than place an order with an out of state merchant and await delivery." Id. at 933. Not only was Century merely a browser instead of a purchaser, but contact between the parties was initiated by plaintiff, not Century. This isolated contact with New Hampshire does not constitute a decision to participate in the local economy. Thus, defendant has not purposefully availed itself of the privilege of doing business in New Hampshire. With respect to plaintiff's contract claim, defendant's due process rights impede the jurisdictional power of this court.

However, the jurisdictional issue weighs in favor of plaintiff with respect to his tort claims. While Century engaged in minimal activity in New Hampshire, for purposes of minimum contacts "it is not always necessary that the defendant's conduct take place in the forum state." Helitzer v. Helitzer, 761 F.2d 582, 585-86 (10th Cir. 1985) (citing R. Casad, Jurisdiction in Civil Actions ¶ 2.05 (1983)). Sometimes it may be sufficient if his

13

conduct elsewhere causes an effect in the forum.  The general rule is if defendant, through out-of-state conduct, intentionally causes a tortious injury in the forum, jurisdiction will lie for claims arising from that injury.  Hugel v. McNell, 886 F.2d 1, 4 (1st Cir. 1989); see also Rivera v. Bank One, 145 F.R.D. 614 (D.P.R. 1993) (finding sufficient contacts where act of defendant outside the state caused a tortious injury within the state).

Locating the injury situs of Century's alleged torts is somewhat difficult.  This is not a case of physical injury which has a definite spatial quality.  Rather, the injury at issue is purely economic in nature, making it difficult to pinpoint exactly where the injury occurs.  See Kowalski, supra, 787 F.2d at 10-11 (discussing difference between physical and economic injury).  Further, this difficulty cannot be ameliorated by looking to where state law defines the situs of tortious injury. Minimum contacts analysis is a matter of federal constitutional law, and its resolution cannot turn on state law definitions having no independent significance beyond setting the scope of jurisdiction.

Nonetheless, some courts have held that, for purposes of constitutional inquiry, the situs of tortious injury arising from interference with intellectual property is the place of plaintiff's residence.  Crosfield Hastech, Inc. v. Harris Corp.

14

672 F. Supp. 580, 587 (D.N.H. 1987). As one court has noted, "'[d]amage to intellectual property rights (infringement of a patent, trademark or copyright) by definition takes place where the owner suffers the damage.'" Dakota Indus., Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1388 (8th Cir. 1991) (quoting Acrison, Inc. v. Control & Metering Ltd., 730 F. Supp. 1445, 1448 (N.D. Ill. 1990)) (emphasis in Acrison). These courts reason that, with respect to intellectual property protected under state law, the state of plaintiff's residence is the creator of the rights infringed. See Paolino v. Channel Home Centers, 668 F.2d 721, 724 n.2 (3d Cir. 1981) (noting that "[s]ince intellectual property cannot have a physical situs the law of the state of residence of the person who initially developed and protected the secret appears to be the obvious starting point for its protection"). When a nonresident interferes with intellectual property, it is foreseeable that the state creator would reach out through its courts to protect and ensure possession of rights it has bestowed upon its citizens.

Here, the rights possessed by plaintiff in his idea were born of New Hampshire law. Upon Century's alleged tortious interference with those rights, plaintiff need look no further than New Hampshire courts to pursue redress from his injury. Thus, jurisdiction for plaintiff's tort cause of action is proper

15

under the well-established rule that one who knowingly causes tortious injury in a forum cannot invoke constitutional protections to avoid being hailed into court there.  Calder v. Jones, 465 U.S. 783, 790 (1984).

When, as here, some causes of action are jurisdictionally sound and others are not, precedent provides scant guidance on the proper course to follow.  SCHWARZER, TASHIMA, WAGSTAFFE, CALIFORNIA PRACTICE GUIDE, FEDERAL CIVIL PROCEDURE BEFORE TRIAL ¶ 3:91, at 3-18 (1994).  There are three possibilities:  the court could (1) dismiss only the jurisdictionally improper claim while retaining jurisdiction over the others; (2) permit trial for the entire case because jurisdictional requirements are satisfied for one of the claims; or (3) dismiss the entire case because part of it is jurisdictionally defective.  Examination of the course the law has taken on this issue is in order.

Under the doctrine of pendent personal jurisdiction, some courts have retained jurisdiction over the entire case notwithstanding the jurisdictional defect for one of the causes of action.  See Amtrol, Inc. v. Vent-Rite Valve Corp., 646 F. Supp. 1168, 1173-76 (D. Mass. 1986).  The doctrine had its origin in federal question cases where state law claims were tacked onto federal causes of action under pendent subject matter jurisdiction.  Robinson v. Penn Central Co., 484 F.2d 553, 553-56

16

(3rd Cir. 1973). Since subject matter jurisdiction rested on the existence of a federal question, Rule 4 of the Federal Rules of Civil Procedure, as opposed to state long arm statutes, governed statutory authorization to exercise personal jurisdiction over the defendant. Once Rule 4 was satisfied for the federal cause of action, the issue became whether Rule 4 required an independent basis for the assertion of personal jurisdiction over the pendent state law claims, or whether jurisdiction over defendant for the federal cause of action automatically, and without more, attached for the state claims as well. Several courts denied needing an independent basis for each claim and held that Rule 4 authorized exercise of jurisdiction over the entire case, including all pendent state claims, so long as jurisdictional requirements for the federal cause of action were met. See Amtrol, supra 646 F. Supp. at 1173-76 (D. Mass. 1986) (discussing much of the caselaw dealing with the issue of pendent personal jurisdiction). Such a view of the legitimate reach of personal jurisdiction under federal rules was not, however, without dissenters. See Connors v. Marontha Coal Co., 670 F. Supp. 45, 47 (D.D.C. 1987) ("Although federal courts can exercise pendent subject matter jurisdiction to bring a claim ordinarily outside the court's limited jurisdiction within the subject matter jurisdiction of the court, there is no analogous concept

of pendent personal jurisdiction.") (citation omitted); <u>Debreceni v. Bru-Jell Leasing Corp</u>., 710 F. Supp. 15, 19 (D. Mass. 1989).

The doctrine of pendent personal jurisdiction was subsequently borrowed in aid of interpreting state long-arm statutes. Courts began to hold that if jurisdiction over some claims in a complaint would otherwise fall under the state long-arm statute, those claims could, nonetheless, ride piggyback on other of the claims whose long-arm jurisdiction was upheld. <u>Val Leasing, Inc. v. Hutson</u>, 674 F. Supp. 53, 56 (D. Mass. 1987). Under this interpretation, as long as the long-arm statute authorized jurisdiction for one cause of action in a complaint, jurisdiction over all the causes of action was proper.

However, as the doctrine has its roots in construction of jurisdictional statutes, it is unclear whether the "good as to one, good as to all" rule has a place on the constitutional side of the jurisdiction inquiry. There are both statutory and constitutional requirements for proper jurisdiction, and the doctrine under discussion has, to date, been employed to satisfy only the former. Using the doctrine to bring within the court's jurisdiction claims that do not otherwise satisfy constitutional requirements is more problematic. After all, statutory requirements are defined simply by legislative will, whereas constitutional requirements are defined by individual right.

18

Given this, projection of the rule from the statutory into the constitutional elements of the jurisdiction inquiry is by no means manifest. And thus far no courts have explicitly made such a projection, much less justified it.

The courts that pioneered the doctrine as an interpretation of Rule 4 did not offer opinion about exercising pendent personal jurisdiction over claims that would otherwise fail constitutional requirements, nor did they need to. Since the "anchor" cause of action was a federal question, constitutional limitations on jurisdiction were less stringent, and the defendant need only have minimum contacts with the United States, not the forum location of the federal court. In these pioneer cases, minimum contact with the United States was clear, and constitutional requirements were independently met for both the anchor federal claim and the state claims. Robinson, supra, 484 F.2d at 554 ("the issue is primarily a matter of interpretation of [federal jurisdictional rules] since it is not disputed that Congress could constitutionally expand service of process of federal courts throughout the United States"). These courts employed pendent personal jurisdiction to satisfy only statutory and not constitutional requirements.

While marginally more helpful, the cases extending the doctrine to state long-arm statutes do not bring its

constitutional significance into the sharp focus that is appropriate. One court, after holding that the state long-arm statute permitted pendent personal jurisdiction, simply never reached the constitutional inquiry, leaving unanswered the propriety of pendent personal jurisdiction over claims for which constitutional requirements are otherwise not met. Val Leasing, supra, 674 F. Supp. at 56 (concluding no more than that "Massachusetts law permits pendent personal jurisdiction"). Another court, while reaching the constitutional elements of the jurisdiction inquiry, Home Owners Funding Corp. of America v. Century Bank, 695 F. Supp 1343, 1345-46 (D. Mass. 1988), did not make clear whether jurisdiction was improper for the pendent cause of action under both the state long-arm statute and the constitution or just under the long-arm statute. Id.; see also Murphy v. Erwin-Wasey, Inc., 460 F.2d 661, 663-64 (1st Cir. 1972) (holding that jurisdiction for plaintiff's contract claim was proper under Massachusetts long-arm statute simply because jurisdiction over plaintiff's tort claim was proper, but failing to dismiss whether constitutional requirements for assertion of jurisdiction were or were not met for contract claim). If jurisdiction for the pendent cause of action was only improper under the statute, but in all other respects proper under the Constitution, then the court only relied on the doctrine to

correct the statutory defect.  However, the court's discussion was unclear on this issue.

As far as this court is aware, the district court in Nelson v. R. Greenspan & Co., 613 F. Supp. 342 (D. Mo. 1985), has cast the one clear vote in favor of turning pendent personal jurisdiction into a constitutional doctrine.  But see Jack O'Donnell Chevrolet, supra, 276 F. Supp. 1002 ("We must separately consider the three counts in which defendant is named, since sustenance of jurisdiction over one would not necessarily confer jurisdiction over others.").  Having found sufficient minimum contacts to support personal jurisdiction for one count in the complaint, the court stated "personal jurisdiction is also appropriate as to Count II, even though defendant's contacts with [the forum] might not be sufficient for them to be subject to personal jurisdiction in [the forum] with respect to Count II alone."  Id. at 346.  The court reasoned that "plaintiff's breach of contract claim is based on the same core facts as the fraud claim and requiring plaintiff to bring the contract claim in another forum would result in unnecessarily duplicative litigation and a waste of judicial resources."  Id.

Despite any ambiguity as to whether said doctrine can sanction jurisdiction for a claim not otherwise justifiable under the Constitution, this case calls out for its application.  To

justify this, it is necessary to examine why the fact that New Hampshire felt the "effects" of defendant's conduct is dispositive of the jurisdiction issue for the tort claim and not the contract claim, even though both arise from the same harmful effects; namely, the uncompensated loss of proprietary rights in plaintiff's idea.  The most apparent difference, and the one that has constitutional significance between the two causes of action, is the source of the rights at issue.  With respect to torts, the state creates the rights, whereas the parties themselves are the source of contractual rights.  When the state defines rights against tortious conduct, it is publicly proclaiming its will to deter that specific conduct, and when ignored by individuals engaging in proscribed conduct, the state has a heightened interest in judicially redressing any injurious effects felt within its border.  As the Supreme Court has noted:

> A state has an especial interest in exercising judicial jurisdiction over those who commit torts within its territory.  This is because torts involve wrongful conduct which a state seeks to deter, and against which it attempts to afford protection, by providing that a tort-feasor shall be liable for damages which are the proximate result of his torts.

Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 776 (1984). Given the state's "especial interest," it becomes more foreseeable that the state would call upon the wrongdoer to

22

defend his actions and set things within the state's borders to right.

However, the state feeling the brunt of the effects from contract breach has not suffered such an affront to its interests. <u>Lakeside Bridge & Steel v. Mountain State Constr.</u>, 597 F.2d 596, 602 n.11 (7th Cir. 1979) ("The forum state has a lesser interest in protecting a corporation in an interstate contract dispute . . . because the effects of a commercial contract are unlikely to involve danger to persons or things within the state's borders."). Because the source of the infringed right is the parties, not the state, the state has not sought to deter the specific conduct constituting breach, but rather has remained ambivalent about the rightfulness or wrongfulness of such conduct. The state's interest is implicated only if the conduct can be characterized as a broken promise, and it is only the broken promise that the state seeks to deter. In a contract dispute, states feeling the effects of specific conduct that is in itself harmless have no special connection with the case such as would support exercise of jurisdiction over one causing such effects. Rather, the defendant must have other ties and connections with the state. If this reasoning is formalistic, it is, nonetheless, the only apparent justification for a set of jurisdictional rules under which a state that

23

suffers the effects of tortious conduct may assert jurisdiction, whereas a state that feels the effects of contract breach may not necessarily do so.

But when, as here, the specific conduct constituting breach of contract is also tortious, the state has expressed its deference interest by making such conduct the subject of tort liability.  It should not matter for jurisdictional purposes whether the plaintiff chooses to characterize the conduct as a breach of contract or tortious or both, because the state's deference interest remains constant.  After all, by any other name, a rose is still a rose.  If there is jurisdiction over the tort based on the state's "especial interest" in deterring the specific conduct, then so too will jurisdiction over contract claims arising from that same conduct be proper.  This result obtains even though the forum contacts related to the contract claim are, by themselves, insufficient to support jurisdiction.[1]

_____

[1]During the course of litigation, if plaintiff is unable to sustain the burden of proving the tortious nature of the conduct, the question arises whether the court is divested of jurisdiction over the rest of the case.  In Val Leasing, supra, 674 F. Supp. at 56, the court held that judgment over defendant on the "anchor" claim does not remove the foundation for exercising personal jurisdiction with respect to the pendent claims.  However, the Val Leasing court was discussing the proper results under the state long-arm statute.

Whether this approach, however, has a place in constitutional analysis of the jurisdiction issue depends on the exact nature and content of the defendant's rights protected by the Due Process Clause.  If the clause protects an interest

24

Therefore, the court denies in its entirety defendant's motion to dismiss for lack of personal jurisdiction.

## 2. Transfer

Century urges this court to transfer the case to federal court in Ohio pursuant to 28 U.S.C. § 1404(a), which provides that "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Circumstances justify transfer if plaintiff's choice

---

against "inconvenient litigation" in a forum with which the defendant has no minimum contacts, United States v. Morton, 467 U.S. 822, 828 (1984), then retaining jurisdiction despite loss on the anchor claim would not violate due process. After all, courts often assert jurisdiction based on allegations that the defendant caused a tortious injury in the forum, even though it may turn out that the conduct was not tortious after all, and thus that the defendant had never established minimum contacts there. If this does not violate due process, then it should not make a constitutional difference that a pendent claim is added, because the incremental inconvenience of defending the additional claim is minimal, even if the defendant cannot do so successfully.

However, if the Due Process Clause protects the interest in "not being subject to the binding judgments of a forum with which [defendant] has established no meaningful contacts, ties, or relations," Burger King, supra, 471 U.S. at 472, then the case must be dismissed once the "anchor" claim falls. Once it becomes apparent that the conduct was not tortious, negating the existence of minimum contacts, then no binding judgments may be issued against the defendant, and the pendent claim must be dismissed. Nonetheless, this issue does not have to be resolved unless and until it is established that Century's conduct cannot be labeled tortious.

of forum poses a greater inconvenience relative to the forum to which transfer is sought. How much more inconvenience must be shown to justify transfer and, conversely, how much deference is due plaintiff's initial choice of forum is not clearly established in this circuit. But see Royal Bed and Spring Co. v. Famossul Industria e Comercio de Moveis, Ltda., 906 F.2d 45, 52 (1st Cir. 1990) (discussing deference due plaintiff's choice of forum under 1404(a)'s predecessor doctrine of forum non conveniens). In other circuits, the plaintiff's choice of forum is held in "varying degree of esteem." CHARLES WRIGHT, ARTHUR MILLER, EDWARD H. COOPER, ET AL., FEDERAL PRACTICE AND PROCEDURE § 3848, at 376 (2d ed. 1986).

Some courts hold that section 1404(a) should be liberally construed and are easily persuaded that defendant's right under section 1404(a) to seek a transfer outweighs plaintiff's right to choose a forum. See A.C. Samford, Inc. v. United States, 226 F. Supp. 72 (M.D. Ga. 1963). Given two litigants, each seeking to litigate in their forum of choice, these courts find no reason to defer to the plaintiff's choice simply because he is the plaintiff. Levine v. Arnold Transit Co., 459 F. Supp 233, 235 (N.D. Ill. 1978) ("Why, under 1404(a), one side's preference should carry greater weight than the other's escapes us . . . ."). Under this standard, if the defendant can show that his

26

chosen forum is marginally more convenient than the plaintiff's chosen forum, transfer will be granted.

This court declines to read section 1404(a) as an utter defeat of plaintiff's right to litigate in his forum of choice, but takes guidance from cases such as <u>Ford Motor Co. v. Ryan Ferguson</u>, 182 F.2d 329 (2d Cir. 1950), that hold plaintiff's choice in high esteem. Federal forum rules, wrought from considerations of efficiency and convenience, confer on plaintiff the initial choice of forum under the presumption that the chosen forum is the most convenient. However, section 1404(a) was enacted under the recognition that sometimes the plaintiff's choice, while possibly more convenient for him, results in a net inconvenience after factoring in the burden imposed on defendant. <u>All States Freight v. Modarelli</u>, 196 F.2d 1010, 1011 (3d Cir. 1952) ("The purpose of the limitation [on the plaintiff's privilege of choosing forum] is clearly to make the inevitably uncomfortable . . . judicial process cheaper and more convenient and, if possible, more prompt."). In addition, the plaintiff's choice of forum may have nothing to do with convenience but rather results from an effort to "vex, harass, or oppress" the defendant. <u>Holiday Rambler Corp. v. American Motors Corps.</u>, 254 F. Supp 137, 139 (W.D. Mich. 1966). Thus section 1404(a) modifies the plaintiff's right to litigate in a forum of his

choosing by giving the court a trump card.

If, however, courts read section 1404(a) as a strict limitation on plaintiff's right such that his choice is given no presumptive force, then a net decrease in efficiency will result. In every case, courts and litigants must labor to judge which is the more convenient of two forums. Any efficiency gained from the transfer would be outweighed by efficiency lost from laboring over the transfer question in every case. However, a presumption in favor of plaintiff eases the burden of administering section 1404(a) while, at the same time, leaves room to transfer cases from forum that are so grossly inconvenient that labor expended on the section 1404(a) issue is outweighed by the efficiency losses that would result were the case not transferred. The better rule, then, is that defendant must show plaintiff's choice of forum to be substantially more inconvenient than the alternative proposed by defendant.

A consideration of the factors relevant to determining whether Century has met its burden persuades this court that transfer should not be granted. At the outset, the presumption enjoyed by plaintiff is particularly strong here because his chosen forum is also his home forum. Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255 (1981). When the home forum has been chosen, the choice more likely represents considerations of

convenience rather than vexation or harassment, id. making the hurdles obstructing transfer that much higher.

Section 1404(a) directs the court to first consider the convenience of the parties. At best, this factor is a wash. Granted, it would be inconvenient for Century to litigate this case in New Hampshire due to the business disruption caused by having to uproot a "multitude" of employees from Ohio to New Hampshire. Certainly no less so, it would be burdensome for plaintiff to litigate in Ohio, because he would have to bear the financial burden of transporting himself and his witnesses there, as well as leaving his two jobs for the occasion. Since there is a presumption in favor of plaintiff's choice, transfer is not appropriate where its effect is merely to shift the inconvenience from one party to the other. It is Century upon whom the burden must fall.

Furthermore, weighing the relative inconveniences to the parties requires more than adding up costs in dollars and cents. There is a qualitative component to the balance as well which focuses on the comparative financial strength of the parties, A.C. Samford, supra, 226 F. Supp. at 78, because the costs of litigation should be placed on the party in the best position to absorb and spread them. AMF, Inc. v. Computer Automation, Inc., 532 F. Supp. 1335, 1342 (S.D. Ohio 1982). Clearly that party is

29

Century. In today's business world, the expense of defending lawsuits, both meritorious and nonmeritorious, is an inevitable, yet unfortunate, cost of doing business which can, in turn, be defrayed by passing it on to the ultimate consumer. However, individuals such as the plaintiff, who is not necessarily in the business of inventing things, must alone bear the costs of litigation. If transfer renders the costs of litigation prohibitive, plaintiff may be effectively denied the right to pursue a remedy. Therefore, even if it would cost Century more to defend this suit in New Hampshire than it would for plaintiff to litigate in Ohio, the relative financial strength of the parties counsels against transfer.

Section 1404(a) also requires the court to consider the conveniences of witnesses, because justice is better served when the testimony of witnesses is live, rather than by deposition. Chicago Rock Island and Pacific Railroad Co. v. Igoe, 220 F.2d 299 (7th Cir. 1955). Section 1404(a) serves these ends by securing a more convenient forum for witnesses to appear with their live testimony. But if appearance of witnesses can be secured regardless of the forum's location through court order or persuasion by an employer who is a party to the action, this factor becomes less important. Furthermore, courts have held that this factor is not merely a battle of numbers favoring the

30

party that can provide the longest list of witnesses it plans to call. LaCroix v. American Horse Show Assoc., 853 F. Supp. 992, 1001 (N.D. Ohio 1994). Rather, the focus is on the key witnesses, because loss of live testimony of less central witnesses is not so great a price for honoring plaintiff's choice. This factor thus considers the convenience of key witnesses who cannot be compelled or persuaded to appear in a distant forum.

Plaintiff claims that Century stole his idea, and Century claims that it developed and marketed the product independently long before it received any drawings from plaintiff. Thus Century's employees who were involved in the alleged independent development and marketing of the product are certainly "key witnesses." Of this group of key witnesses, Century claims that about half are no longer employees, and thus the inconvenience of New Hampshire to them would force Century to present their testimony by deposition. However, given that half the group of key witnesses are still employees and can be persuaded to appear in New Hampshire, the testimony of the non-employees may be duplicative, and Century has provided no reason to believe otherwise. Their deposition testimony therefore would not result in the harm at which section 1404(a) is aimed.

Century has failed to carry its burden of establishing such

31

substantial relative inconvenience, and this court denies the motion to transfer.

### 3. Defendants' Motions Under Rule 12

Century has moved to dismiss all counts of plaintiff's complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P., for failure to state a claim upon which relief can be granted. A Rule 12(b)(6) motion will be granted only if, accepting all of the plaintiff's factual averments contained in the complaint as true, and drawing every reasonable inference helpful to the plaintiff's cause, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988). The court's inquiry is a limited one, focusing not on "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). In making its inquiry, the court must accept all of the factual averments contained in the complaint as true, and draw every reasonable inference in favor of the plaintiff. Garita Hotel Ltd. Partnership v. Ponce Fed. Bank, 958 F.2d 15, 17 (1st Cir. 1992).

### a. Waiver

At the outset, Century urges the court to dismiss pursuant to Rule 12(b) all plaintiff's causes of action on grounds that the plaintiff agreed to waive all rights except those arising under patent law. The contract provision supposedly producing this effect is contained in paragraph 9 of Century's ISP form signed by plaintiff, which provides "[b]y reviewing your idea no agreement to compensate you is being entered into by us, and you agree to rely solely upon your rights under the patent laws." Since none of the rights claimed by plaintiff arise under patent laws, Century argues that the complaint fails to state a claim upon which relief can be granted.

The issue is governed by New Hampshire law.[2] To determine the effect of this clause on the rights claimed by plaintiff, the contract and tort causes of action must be distinguished. In the

---

[2]When, as here, parties do not "raise a conflict of law issue in this diversity suit . . . we see no reason to discuss the issue of choice of law," American Home Assurance Co. v. Stone, 61 F.3d 1321, 1324 (7th Circuit 1995), but will instead apply New Hampshire law. The parties are free to make their own choice of law through contractual arrangement. When neither party contests choice of law at trial, it is constructively equivalent to designating choice of law by contract.

Further, the law necessary to resolve the waiver issue is essentially the same in both Ohio and New Hampshire. Compare Collins v. Click Camera & Video, Inc., 86 Ohio App. 3d 826, 832, 621 N.E.2d 1294, 1298 (1993) with New Hampshire Karting Assoc., 128 N.H. 102, 106, 509 A.2d 151, 153 (1986). Therefore, it is unnecessary to resolve the choice of law question.

eyes of New Hampshire law, contractual obligations are easier to waive than those arising under tort law.  Barnes, supra note 2, 128 N.H. at 106, 509 A.2d 153.  As the First Circuit has noted, "language necessary to waive contractual obligations may not be sufficient to waive tort liability."  Burten v. Milton Bradley Co., 763 F.2d 461, 465 (1st Cir. 1985).  The Burten court reasoned that it is against public policy to permit parties to easily contract out of obligations imposed by tort law.  Id. at 467.  The state's interest in shaping behavior and achieving other substantive goals through tort law should not be easily overridden by contractual arrangements.  See supra note 2, 128 N.H. at 106, 509 A.2d 153 (noting tension between goals of holding individuals to tort obligations and of allowing maximum possible "freedom of choice" in allowing parties to "contract freely about their affairs").

Thus there are two standards by which to judge the effectiveness of waivers--one for tort obligations and the other for contractual.  Tort waivers must "clearly and unambiguously" disclaim the waiving party's obligation to conform its conduct to the requirements of tort law.  Burten, supra, 763 F.2d at 465; Wright v. Loon Mountain Recreation Corp., 140 N.H. 166, ___, 663 A.2d 1340, 1342 (1995) (holding that exculpatory language must "clearly and specifically indicate the intent to release the

defendant from liability for personal injury caused by defendant's negligence"). On the other hand, the content of contractual obligations is defined by the parties' intent, and it is there that the court must look to judge the effectiveness of waiver of those obligations. Under standard rules of contract interpretation, contractual language need not be clear and unambiguous to be given effect, but rather a lower threshold of clarity is applicable. The effect of the waiver in the ISP form on Century's tort liability will be discussed first, then Century's contractual obligations to plaintiff, if any, will be addressed.

The general language of this provision of the ISP form is not of sufficient clarity to waive Century's tort liability. To constitute a clear and unambiguous waiver, the language must disclaim the specific obligation that the waiving party seeks to avoid. See Burten, supra, 763 F.2d at 466 (holding that contract clause purporting to limit plaintiff to "such rights as I may have under U.S. Patent laws" did not preclude recovery for tortious misappropriation of trade secret); see also Audley v. Melton, 138 N.H. 416, 418, 640 A.2d 772, 779 (1994) (holding that promise to hold defendants "free of any or all liability" did not release defendants from liability for negligence because language was too general). If a party refuses to conform his conduct to

35

the requirements of tort law, he should have to bear the costs of forewarning other market participants with which he hopes to deal. Thus the waiving party has the responsibility of announcing his disclaimer in language that leaves no doubts as to the specific conduct he wishes to hold above the state's tort law. General language in paragraph 9 of the ISP form attempting, in one broad sweep, to nullify all plaintiff's rights except those that arise under patent law does not discharge Century's responsibility of explicit candor to the inventor community, and all plaintiff's tort claims will not be bundled up and discarded. Century would cut with an axe where it should be doing so with a scalpel.

Century's ISP form does, however, contain a more specific clause purporting to disclaim a specific tort obligation to which the discussion will now turn. Paragraph 8 of Century's ISP form contains a clause warning that "no confidential relationship is being established" between the parties. Century contends this disclaimer precludes liability for trade secret misappropriation, as well as for breach of fiduciary duty. Counts IV and II, based respectively on the two above theories of liability, should fall under Rule 12(b) according to Century.

Count IV is premised on tort law protection to the owner of a trade secret for the misappropriation of his ideas. Id. at

36

462. Tort law defines the essence of the wrong as the "breach of the duty not to disclose or to use without permission confidential information acquired from another." Id. (quoting Jet Spray Cooler, Inc. v. Crampton, 377 Mass. 159, 165, 385 N.E.2d 1349, 1354 (1979)). However, the duty not to disclose or impermissibly use only arises in the context of a confidential relationship. In the absence of such, the parties are merely competitors. And, while possibly constituting poor business ethics, the appropriation of a competitor's trade secrets takes place outside the common law's strictures in the world of free market competition. Plaintiff must show that he shared a confidential relationship with defendant, possessed a trade secret, and disclosed it to defendant, and that defendant made use of the disclosure in breach of the confidence reposed in him. RESTATEMENT OF TORTS § 757 (1939).

A confidential relationship may arise by operation of law from the affiliation of the parties and the context in which the disclosures are offered. Burten, supra, 763 F.2d at 463. But courts hold that an implied confidential relationship can be defeated if the parties, by agreement, expressly disclaim any such relationship. As one treatise on the subject has noted:

> A disclosure expressly received in confidence may create a confidential relationship. Conversely, express disclaimer by the disclosee of a confidential relationship from the outset will

37

dispel the existence of such a relationship.
R. Milgrim, *Trade Secrets* § 4.03 at 4-18 (1984).  However, as it purports to waive tort liability, the language must clearly and explicitly indicate unwillingness to enter the relationship. This is the standard to which Century's waiver of confidential relationship must be held.

The First Circuit in <u>Burten</u> considered a waiver, similar to the one at issue here, purporting to negate any confidential relation between the parties.  <u>Burten</u>, <u>supra</u>, 763 F.2d at 464-67. The clause there boldly and comprehensively disclaimed the existence of "any relationship" between defendant and plaintiff. Nonetheless, the court held that this language does not manifest the requisite clarity and explicitness.  <u>Id.</u> at 466.  The court reasoned that "relationship" can be understood as referring to the ties between the parties only during defendant's review of plaintiff's idea.  Read this way, the waiver was silent as to the nature of the ties and obligations that arose after completion of the review procedure when defendant decided to make affirmative use of the ideas submitted.

In the instant action, Century did use some of the buzz words that were absent from the waiver held insufficient in <u>Burten</u>.  While the <u>Burten</u> waiver was of "any relationship," the more specific waiver here disclaims "any confidential

38

relationship." Although this waiver is more explicit than the Burten waiver, it is neither unambiguous nor certain. There is nothing magical about the invocation of "confidential." If, as the Burten court held, "any relationship" may refer only to ties during the review procedure, so too may "confidential relationship" be read that way, thus excluding from the waiver's coverage any ties and obligations that arose after Century decided to affirmatively use the idea. This reading is buttressed by the language of the waiver clause, "It may be necessary to consult with industry experts. Therefore, no confidential relationship is being established between us." The waiver appears to only address Century's potential liability for failure to maintain secrecy by consulting industry experts in aid of the review procedure, rather than for disrespecting plaintiff's proprietary rights should they decide to use the idea. Granted, this may be only one of several reasonable understandings of the language, but this is enough for the court to hold that the language does not constitute a clear and unambiguous waiver and that Count IV and Count II will not be dismissed under Rule 12(b).

It is a closer call whether the waivers contained in the ISP form negate any contractual obligations to honor the plaintiff's proprietary rights in the idea should Century decide to use it,

39

and thus whether plaintiff's breach of contract claim (Count I) should be dismissed under Rule 12(b).  As indicated earlier, waiver of contractual obligations need not be "clear and unambiguous" so long as it manifests the parties' intent to bind themselves to the waiver.  Under New Hampshire law, the intent of the parties is determined from the plain meaning of language used unless there is an ambiguity.  Echo Consulting Services v. North Conway Bank, 140 N.H. 566, 569, 669 A.2d 227, 230 (1995).  If the language contains more than one reasonable meaning, the contract is considered ambiguous, and extrinsic evidence is admissible for clarification.  Gamble v. University System of New Hampshire, 136 N.H. 9, 13, 610 A.2d 357, 361 (1992).

The language of Century's form, taken as a whole, is susceptible to two reasonable interpretations concerning the contractual rights of the parties should Century decide to use the idea.  The general disclaimer in paragraph 9 may be an unequivocal disclaimer of contractual obligations to compensate plaintiff, regardless of whether Century decides to use the idea.  On the other hand, the point may be to deny any such obligation to plaintiff, not upon affirmative use of his idea, but rather for merely undertaking a review.  This is supported by paragraph 13 of the form, which provides, "If we are interested in your idea, you agree to negotiate with us for rights thereto," and

40

indicates that Century's decision to use the idea carried with it an obligation to honor plaintiff's proprietary rights. Since there are two reasonable interpretations, the contract is, by law, ambiguous.

Under New Hampshire law, ambiguities are resolved by the court as a matter of law. Id., 610 A.2d at 361. Given a choice between two reasonable interpretations of a contract, New Hampshire courts "will, where possible, avoid construing the contract in a manner that leads to harsh and unreasonable results or places one party at the mercy of others." Id. (quoting Thiem v. Thomas, 119 N.H. 598, 604, 406 A.2d 115, 119 (1979)). Taking cue from this principle of construction, this court declines to read this contract as an unequivocal waiver of any obligation to provide any compensation under any condition. Such interpretation must rest on the assumption that plaintiff submitted his idea with no expectation of compensation beyond what was provided as a matter of grace and generosity from Century. In refusing to entertain such an unreasonable assumption, this court concurs with the First Circuit when it pronounced, "We are hard pressed to understand why . . . inventors would submit their ideas for consideration and thereby waive all rights to compensation for their work." Burten, supra, 763 F.2d at 467.

41

When each of two parties to a contract have conflicting expectations, those of one party are not inherently entitled to a preference in contract construction. And contrary to plaintiff's expectations, Century may very well have expected to use the idea free from any contractual rights of the plaintiff. However, Century must have known plaintiff expected to be paid for use of the idea. And Century should not profit by receiving ideas submitted under known expectation of payment, while at the same time arguing that such expectations are misguided because its disclaimer shields it from any obligations to pay. To avoid such harsh results, this court interprets the ambiguous language of the contract to impose an obligation on Century to respect plaintiff's proprietary rights in the idea. Therefore, plaintiff's breach of contract claim (Count I) will not be dismissed under Rule 12(b).

b. Conversion

Having ruled that plaintiff's tort and contract claims are not nullified by the alleged waivers in the ISP form, the court will now briefly consider Century's further arguments for dismissal under Rule 12(b). The first of these is that the conversion claim (Count VI) fails because plaintiff had no legally protectable property interest in his idea.

42

It is settled New Hampshire law that "conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." Curtis Mfg. Co. v. Plasti-Clip Corp., 888 F. Supp. 1212, 1233 (D.N.H. 1994) (quoting LFC Leasing & Fin. Corp. v. Ashuelot Nat'l Bank, 120 N.H. 638, 640, 419 A.2d 1120, 1121 (1980)). With respect to conversion of intangible rights, the RESTATEMENT notes: "the law is evidently undergoing a process of expansion." RESTATEMENT (SECOND) OF TORTS § 242, comment b (1979). As part of the process of expanding the category of interests that are protected under conversion law, this court in Curtis, supra, 888 F. Supp. at 1233, held that the design of a plastic clip device could be the subject of conversion. This court found protection due under the general rule,

> where ideas are formulated with labor and inventive genius, as in the case of literary works or scientific researches, they are protected. Where they constitute instruments of fair and effective commercial competition, those who develop them may gather their fruits under the protection of the law.

Id. (quoting Pearson v. Dodd, 410 F.2d 701, 707-08 (D.C. Cir.), cert. denied, 395 U.S. 947 (1969)). There is not so large a difference in the levels of "labor and inventive genius" exhibited by a "plastic clip device," on the one hand, and a

43

design for a baby carriage, on the other, that this court could hold that the former is entitled to protection as a matter of law and the latter is not. At the very least, it is a jury question.

### c. Uniform Trade Secret Act of New Hampshire

Next, Century claims that Count VII, brought under the Uniform Trade Secret Act of New Hampshire (UTSA), RSA 350-B:1, should be dismissed because plaintiff's idea does not meet the statutory definition of "trade secret." That term's definition has evaded precise standards, but "has come to embody a wide spectrum . . . of information." Kubik, Inc. v. Hull, 56 Mich. App. 335, 345, 224 N.W.2d 80, 86 (Mich. App. 1974). One of the benchmark requirements under the UTSA is that the information not be readily ascertainable to competitors or the public generally, RSA 350-B:1, IV, which, according to Century, does not hold true of plaintiff's design. This seems a peculiar argument for Century, given that it currently has a patent pending for essentially the same design. Also, determining whether information is readily ascertainable to the public requires the types of factual judgment that are left to "juries not courts." Zoecon Indus. v. The American Stockman Tag Co., 713 F.2d 1174, 1179 (7th Cir. 1983). The second statutory requirement, that the information be "the subject of efforts that are reasonable under

the circumstances to maintain its secrecy," requires similar factual judgment. The proper forum for Century's arguments concerning plaintiff's lack of a trade secret is the jury, not this court, and it is to the jury that this court defers resolution of the UTSA claim.

### d. New Hampshire Consumer Protection Act

Lastly, Century seeks dismissal of Count VIII brought under New Hampshire's Consumer Protection Act, RSA 358-A (1993), on the ground that Century's conduct is not covered by the Act. The Act casts a wide net. Gilmore v. Bradgate Assoc., Inc., 135 N.H. 234, 604 A.2d 555, 557 (1992). In Curtis, this court held that the Act covered the conduct of a seller of products who wrongfully appropriated another's idea in designing those products. Curtis, supra, 888 F. Supp. at 1217. The facts of Curtis are almost identical to the facts here, which therefore are controlled by Curtis's holding. Plaintiff's Consumer Protection Act cause of action will not be dismissed under Rule 12(b).

### Conclusion

For the foregoing reasons, the court denies defendant's motion to dismiss for lack of personal jurisdiction and to

transfer the case to the Northern District of Ohio, and denies

defendant's motion to dismiss as to Counts I through VII of the

complaint.

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

October 23, 1996

cc:   Paul M. DeCarolis, Esq.
      Eugene A. Feher, Esq.
      W. Wright Danenbarger, Esq.
      Michael E. Sobel, Esq.