Strafford
No. 91-271

ANDREW GAMBLE & a.

v.

THE UNIVERSITY SYSTEM OF NEW HAMPSHIRE & a.

July 15, 1992

*Patrick W. Fleming*, of Hampstead, on the brief and orally, for the plaintiffs.

*Nelson, Kinder, Mosseau & Gordon,* of Manchester (*Martha V. Gordon* on the brief and orally), for the defendants.

BROCK, C.J. The plaintiffs, Andrew Gamble, Jennifer Hodges, Joanne Dowd and Michael Wolf, students at the University of New Hampshire (the University) during the 1990 spring semester, brought suit against the defendants, The University System of New Hampshire and its Board of Trustees, as a result of a mid-semester tuition increase. The Superior Court (*Dickson,* J.) granted the defendants' motion for summary judgment, from which the plaintiffs now appeal. We affirm in part, reverse in part, and remand for further proceedings.

Andrew Gamble, Jennifer Hodges and Joanne Dowd were in-state students at the University for the 1989–90 academic year. During this time, Michael Wolf, a student at the University of Connecticut, was attending the University pursuant to the New England Regional Compact (NERC). The NERC allows out-of-state students, whose university does not carry the students' desired major, to attend the University. The tuition for these students is the in-state tuition rate plus twenty-five percent.

Prior to the 1989–90 academic year, all graduate and undergraduate students were presented with a "School Catalog," which stated the cost of attending the University for that year. The catalogs informed the students that they would have to pay all bills for the spring semester "in full" on or before the last day of registration, January 23, 1990. Both the undergraduate and graduate catalogs stated that the University reserved the right to revise its schedule of tuition and fees (hereinafter "reservation of rights").

In the fall of 1989, the State experienced fiscal problems and the Governor proposed a State spending cut of five to ten percent. State appropriations to the University would be reduced by an equal percentage. In addition to freezing faculty positions and cutting other expenses, the University was forced to consider a tuition increase. The possibility of a tuition increase was extensively publicized in articles and editorials of several local newspapers. However, because it would not be known until mid-February whether the budget cut would take place, the University was unsure whether a tuition hike would actually be necessary.

Anticipating the necessity for a tuition increase, the University sent letters notifying all in-state undergraduate students of the possibility of a cost increase on December 1, 1989. (The increase would not be imposed on out-of-state students who were already paying an

unsubsidized price for their education.) Although the exact amount of the tuition increase was not known at the time, the letter stated that "[t]he recommended increases could amount to between $200 and $400." A similar letter was sent to all in-state graduate students on December 18, but no such letters were sent to any NERC students.

Each plaintiff paid the spring semester bill as required and received a receipt that indicated that the balance due was "$0.00." Then, on February 28, after the semester had begun, each student was notified that the tuition was being increased to reflect the legislature's seven and one-half percent reduction in State support for the University.

The plaintiffs brought suit against the University in a four-count complaint, alleging: (1) breach of contract; (2) negligence; (3) a violation of the Consumer Protection Act, RSA chapter 358-A; and (4) a deprivation of constitutional rights. The defendants moved for summary judgment on all four counts, and the plaintiffs moved for summary judgment on the breach of contract and constitutional claims. On May 23, 1991, the defendants' motion was granted. The plaintiffs now appeal, challenging the trial court's dismissal of their breach of contract and consumer protection claims.

The plaintiffs assert that the defendants breached their contract by changing the contract terms, *i.e.*, charging tuition above that set forth in the catalog after the start of the semester, after the plaintiffs had completed their obligation under the contract. Further, according to the plaintiffs, because the contract was one of adhesion, any ambiguous terms must be construed against the defendants as drafters of the document. The plaintiffs also claim that summary judgment was inappropriate regarding their consumer protection claim, in that material issues of fact still exist.

The defendants rely on the language in the catalog, the letters that were sent to the students and the extensive media coverage of the situation to show that the plaintiffs could have reasonably expected an increase in the cost of their education. Therefore, the defendants argue the tuition increase did not constitute a breach of contract. Further, according to the defendants, the plaintiffs' consumer protection claim must be denied, as a matter of law, if the defendants had the contractual right to raise tuition. In the alternative, the defendants claim that the uncontroverted facts fail to demonstrate any bad faith.

■ The parties do not dispute that the agreement between them is primarily governed by contract principles. The relationship be-

tween a university and its students is distinctive, however, and a strict doctrinal approach is inappropriate. *Lyons v. Salve Regina College,* 565 F.2d 200, 202 (1st Cir. 1977), *cert. denied,* 435 U.S. 971 (1978). Thus, although the first step of analysis is to examine the language of the contract under the basic tenets of contract law, the parties' unique relationship must also be considered.

■■ "[A]s a general rule, the proper interpretation of a contract is ultimately a question of law for this court, and we will determine the meaning of the contract based on the meaning that would be attached to it by reasonable persons." *Goodwin Railroad, Inc. v. State,* 128 N.H. 595, 602, 517 A.2d 823, 829 (1986). In interpreting the terms of the contract, we will consider the objective intent of the parties at the time the contract was made. *C & M Realty Trust v. Wiedenkeller,* 133 N.H. 470, 476, 578 A.2d 354, 357 (1990); *see also Kilroe v. Troast,* 117 N.H. 598, 601, 376 A.2d 131, 133 (1977) (intentions of parties to contract are determined based on terms of agreement taken as a whole and contract will be given meaning that would be attached to it by a reasonable person); *Citizens Nat. Bank v. Hermsdorf,* 96 N.H. 389, 393, 77 A.2d 862, 866 (1951) (standard for determining intent is meaning a reasonable person in plaintiff's position would attach to contract). Any determination of the intent of the parties is ultimately to be made by this court. *R. Zoppo Co. v. City of Dover,* 124 N.H. 666, 670, 475 A.2d 12, 15 (1984).

According to the plaintiffs, the catalog quoted a specific price for tuition and the language that all bills must be paid "in full" prior to the end of registration. Therefore, the plaintiffs argue, upon paying their tuition prior to the start of the semester and receiving a receipt marked with a zero balance, their obligation under the contract was completed. This, they contend, constitutes a unilateral contract in that they have fully performed, but the other party has yet to fulfill its promise. In such an agreement, once performance has occurred, the contract is formed and may not be unilaterally altered by either party. Thus, the plaintiffs conclude, because the defendants could not raise the tuition without the students' consent, it was reasonable for them to expect that there would be no increase in the tuition for the spring semester.

■ Contrary to the plaintiffs' assertion, however, their obligations under the contract were not completed simply by paying their tuition bill. The relationship between the University and the student is ongoing throughout the semester: the University must provide the student with a worthwhile education and the student must perform

"financially, academically, and behaviorally in accordance with the college rules and regulations." *Merrow v. Goldberg*, 672 F. Supp. 766, 774 (D. Vt. 1987). Therefore, because the plaintiffs had not, and could not have, fully performed prior to the end of the semester, the contract is not a unilateral one requiring the school to provide an education to the student upon receipt of the tuition payment, regardless of the actions of the student throughout the semester. It follows that the plaintiffs' claim that they fulfilled their obligation and the University breached the contract due to the unilateral nature of the contract is without merit.

The plaintiffs next argue that the contract is one of adhesion; thus, any ambiguous language must be construed against the defendants as the drafter of the document. According to the plaintiffs, the phrase "reserves the right to [raise] . . . tuition" is ambiguous in that it is unclear as to when the right terminates. Therefore, they argue, it must be construed in their favor and be read to terminate upon the last day of registration. The defendants contend that the language is not ambiguous and that it gives them the authority to raise the tuition rate at any time prior to the end of the academic year.

 The language of a contract is ambiguous if the parties can reasonably differ as to its meaning. *Woodstock Soapstone Co. v. Carleton*, 133 N.H. 809, 815, 585 A.2d 312, 315 (1991). Any ambiguous language in the contract will be interpreted by the court. *Commercial Union Assurance Cos. v. Town of Derry*, 118 N.H. 469, 471, 387 A.2d 1171, 1172 (1978), *rev'd on other grounds*, 122 N.H. 711, 451 A.2d 358 (1982).

██ The cost of attending the University was published in the catalog, albeit with the express reservation that the University may adjust the charges to be assessed. Also printed in the catalog was the requirement that the student pay all outstanding charges prior to the start of the semester. When reasonably possible, all parts of the agreement must be given effect. *Rivier College v. St. Paul Fire Ins. Co.*, 104 N.H. 398, 402, 187 A.2d 799, 803 (1963). We find that a reasonable person could interpret the language of these two clauses to mean that all bills must be paid by the end of the registration period, at which time the reservation of rights clause would be rendered ineffective.

 "This court will, where possible, avoid construing the contract in a manner that leads to harsh and unreasonable results or places one party at the mercy of the other." *Thiem v. Thomas*, 119

N.H. 598, 604, 406 A.2d 115, 119 (1979). To interpret the contract as the defendants urge us to would leave the student at the mercy of the University. The University, by the reservation of rights clause, does not have the right to arbitrarily raise the tuition after the registration time deadline. It is inconceivable that the University could retain carte blanche authority to raise the tuition at any time during the semester for any amount it deems appropriate.

It is not sufficient for the University to put a general disclaimer in the catalog that it may raise the tuition at any time during the semester. The students must be advised of any impending surcharge in order to be able to make an informed decision as to whether they can afford the potential increase or whether they prefer not to enroll at the institution for that semester. Accordingly, the reservation of rights clause in the contract must be construed as the plaintiffs suggest.

The fact that the reservation of rights clause must be construed in the plaintiffs' favor, however, does not end our inquiry. Rather, we must look to all the documents which constitute the agreement and determine the reasonable expectations of the parties.

While it is true that the catalog sets forth various requirements regarding the payment of tuition prior to the start of the semester, it is also true that letters were sent by the University informing all in-state students of an impending increase. Although couched in hopeful terms, the letter specifically stated that the amount of any increase could not be determined until the legislature decided the decreased level of State funding to be given the University. In addition, the school targeted the amount of any increase as between $200 and $400, depending on the amount the University's appropriation was reduced. The letter was included with the spring semester bill that was sent to each in-state student; thus, the in-state students were on notice that there was an excellent chance that the tuition would be raised.

In view of the actual notice sent to each in-state student, as well as the extensive media coverage regarding the proposed increase, we conclude that a reasonable in-state student would have entered into his or her agreement with the University knowing that tuition might well be raised in the middle of the semester. Therefore, we conclude that there was no breach of contract by the defendants when they increased the tuition of the in-state students.

This rationale, however, is not applicable to Michael Wolf, the NERC student. As conceded by the defendants, no letters were sent

to the NERC students notifying them of the potential increase in the tuition costs. The defendants argue, however, that the issue of notice should be remanded to the lower court to determine whether, in light of all the media attention to the issue, Wolf had actual notice. We disagree.

The defendants concede that whether the NERC students received notice of the proposed tuition increase is to be considered by an objective standard, not by the subjective knowledge of each student. The defendants did not lack the addresses of the specific individuals to notify. Rather, they had the opportunity to notify Mr. Wolf and the other NERC students in the same manner they notified all in-state students of the potential tuition increase. Further, it cannot reasonably be concluded that out-of-state students would necessarily read the local papers.

Mr. Wolf paid his bill by the registration deadline. It was not until the end of February, when he received an additional bill for $375, that he was notified that the tuition he paid in January was insufficient. As noted above, the reservation of rights clause was only valid until the end of the spring registration period. Absent notice by the University of the potential increase, a reasonable student would not have anticipated additional charges for tuition to occur mid-semester. Therefore, because no notice was given to Wolf, no raise in tuition may be assessed against him. Consequently, the trial court erred in denying the plaintiffs' motion for summary judgment with respect to Mr. Wolf's breach of contract cause of action.

We now turn to the plaintiffs' assertion that the trial court erred in dismissing their consumer protection claim. According to the plaintiffs' writ, the defendants' acts "constituted an unfair or deceptive act," and the University advertised services "with the intent not to sell them as advertised" in violation of RSA chapter 358-A. The plaintiffs contend that whether the defendants' actions were "unfair" or "intended" are disputed questions of fact, and, therefore, the trial court erred by granting the defendant's motion for summary judgment.

Summary judgment must be granted by the trial court when, after considering the affidavits and any other evidence in the light most favorable to the non-moving party, there are no issues of material fact, and the moving party is entitled to judgment as a matter of law. *Heaton v. Boulders Properties, Inc.*, 132 N.H. 330, 335, 566 A.2d 1127, 1130 (1989). The opposing party's affidavit must contain more than general allegations or denials. It must set forth spe-

cific facts showing a genuine issue for trial. RSA 491:8-a, IV. A review of the record reveals that there are no issues of material fact and that the defendant is entitled to judgment, as a matter of law, on the plaintiffs' consumer protection claim.

Initially, we note that although the trial court ruled that the Consumer Protection Act applies to this case, the issue was neither appealed to, nor briefed for, this court. However, we will assume, *arguendo*, that RSA chapter 358-A applies to the defendants in this case. The underlying facts are undisputed. The catalogs were printed prior to the start of the 1989–90 academic year when the defendants were unaware that the legislature intended to reduce State appropriations to the University for the 1989–90 school year. Once the defendants learned that State aid might be reduced, they notified the affected students of the potential change in as much detail as they had available. While many of the students may have been pressed financially by the increase, they were forewarned of an impending surcharge and had the option of not attending the University that semester. Consequently, we find, as a matter of law, that the defendants' actions did not violate RSA chapter 358-A.

■ Nor do we find the University's failure to mail the notification to the out-of-state NERC students who would be affected by the in-state tuition increases to be "unfair" or "intentionally misleading advertising." Again, the increase was the result of a fiscal emergency. It was imposed soon after the legislature's decision was announced, and it reflected the amount of the decreased aid to the University. Furthermore, the fact that the school failed to notify fewer than 250 of the more than 7,000 students who were billed the additional amount leads us to conclude that the University's failure to notify the NERC students was an oversight, rather than an act of bad faith. Accordingly, there is no violation of the Consumer Protection Act, and the claim was properly dismissed by the trial court.

■ In sum, we reverse the trial court's granting of summary judgment to the defendant on the issue of plaintiff Wolf's breach of contract claim, and order entry of summary judgment on the issue of liability on that claim only. We affirm the trial court on all other issues, and remand for further proceedings.

> *Affirmed in part; reversed in part; remanded.*

BATCHELDER, J., did not sit; the others concurred.