NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Merrimack
No. 2019-0620


DANIEL RO

v.

FACTORY MUTUAL INSURANCE COMPANY, AS SUBROGEE OF TRUSTEES
OF DARTMOUTH COLLEGE


SEBASTIAN LIM

v.

FACTORY MUTUAL INSURANCE COMPANY, AS SUBROGEE OF TRUSTEES
OF DARTMOUTH COLLEGE

Argued: October 22, 2020
Opinion Issued: March 10, 2021


Getman, Schulthess, Steere & Poulin, P.A., of Manchester (Debbie Lorusso Makris on the brief and orally), for plaintiff Daniel Ro.


Law Offices of John B. Schulte, of Bedford (John B. Schulte and Brandon F. Chase on the brief and Mr. Schulte orally), for plaintiff Sebastian Lim.

Monahan & Associates, P.C., of Boston, Massachusetts (Matthew R. Passeri on the brief and orally), for the defendant.

HICKS, J. The defendant, Factory Mutual Insurance Company (Factory Mutual), appeals an order of the Superior Court (Kissinger, J.) denying its motion for summary judgment and granting the motion for summary judgment filed by the plaintiffs, Daniel Ro and Sebastian Lim, in their declaratory judgment action seeking a determination that they are implied coinsureds under a fire insurance policy issued by Factory Mutual to the Trustees of Dartmouth College (the Trustees). We affirm.

The trial court's order recited the following facts. In 2016, the plaintiffs were students at Dartmouth College. They lived in separate dormitories on campus, and each paid room and board in addition to tuition. Prior to being assigned a dormitory room, each of the plaintiffs was required to sign a form acknowledging receipt and understanding of the college's student handbook. Included in the handbook were prohibitions on: (1) possessing charcoal grills in student housing; (2) lighting and burning of any item with an open flame in residence halls; and (3) placing items on, and the use of, "the roof, portico, fire escape, or any other architectural feature not designed for recreational or functional use, except in cases of emergency."

The handbook noted that violation of the open flame policy "may" result in liability for damage due to fire. In addition, the handbook placed responsibility on students for claims arising from damage to college property. It provided that student residents "assume any and all liability for damage or claims that result from their own negligence," or that of their visitors or guests, and that student residents who damage or vandalize Dartmouth property "will typically be expected to pay restitution."

One day in October 2016, the plaintiffs set up a charcoal grill on a platform outside a fourth floor window in Lim's dormitory, Morton Hall. The grill started a fire on the platform, which then spread to the roof. Firefighters used a substantial quantity of water to extinguish the fire, and all four floors of the dormitory sustained water damage. Factory Mutual, which insured the building, paid the Trustees $4,544,313.55 and then brought a subrogation claim against the plaintiffs to recover that amount.

The plaintiffs brought the instant action seeking a declaratory judgment that they are implied coinsureds under the fire insurance policy with Factory Mutual. Factory Mutual brought counterclaims for negligence and breach of contract, which the court stayed pending resolution of the declaratory judgment petition. Both parties moved for summary judgment. The trial court denied Factory Mutual's motion and granted summary judgment in favor of the plaintiffs, concluding that "the expectations and equitable considerations that

2

motivated" this court, in Cambridge Mutual Fire Insurance Co. v. Crete, 150 N.H. 673 (2004), to adopt the doctrine of Sutton v. Jondahl, 532 P.2d. 478 (Okla. Ct. App. 1975), "in the context of tenant-landlord lease agreements apply with equal force in the context of on campus housing agreements with college students."

The trial court accordingly concluded that Factory Mutual could not maintain its counterclaims against either plaintiff. Specifically, the court noted, "To the extent Mr. Lim's possessory interest in Morton Hall is insurable, so is Mr. Ro's. Mr. Ro's possessory interest in Morton Hall is analogous to that of a tenant who rents one unit in a residential complex but causes fire damage to another unit in the complex."

On appeal, Factory Mutual argues that the trial court erred in: (1) concluding that the plaintiffs held a possessory interest in their dormitory rooms; (2) failing to conclude that the plaintiffs were licensees "with a revocable personal privilege to occupy Dartmouth College residence halls" and that, therefore, the anti-subrogation rule we adopted in Crete does not apply; and (3) failing to conclude that policies in the student handbook[1] negated any presumption that the plaintiffs are implied coinsureds under the fire insurance policy.

In reviewing rulings on cross-motions for summary judgment, "we consider the evidence in the light most favorable to each party in its capacity as the nonmoving party and, if no genuine issue of material fact exists, we determine whether the moving party is entitled to judgment as a matter of law." Sabato v. Fed. Nat'l Mortg. Ass'n, 172 N.H. 128, 131 (2019) (quotation omitted). "If our review of that evidence discloses no genuine issue of material fact and if the moving party is entitled to judgment as a matter of law, then we will affirm the grant of summary judgment." Id. (quotation omitted). We review the trial court's application of the law to the facts de novo. Id.

This appeal asks us to determine whether the anti-subrogation doctrine we adopted in Crete applies here. Accordingly, we begin by examining Crete. In that case, a tenant negligently started a fire that caused extensive damage to

---

[1] Factory Mutual asserts, "As a lease is a contract between a landlord and tenant, the Dartmouth College Student Handbook is a binding contract between the Plaintiffs and Dartmouth College." Because no party argues otherwise, we assume without deciding that the student handbook establishes a contractual relationship between the plaintiffs and Dartmouth College. See Walker v. President and Fellows of Harvard College, 840 F.3d 57, 61 n.5 (1st Cir. 2016) (assuming without deciding that law school handbook "set[] out the terms of a contract," where school did not dispute that issue, but noting that "while courts have treated student handbooks as contracts between students and schools, the question of whether such a document always constitutes a contract is, arguably, an unsettled issue under Massachusetts law"); Gamble v. University of New Hampshire, 136 N.H. 9, 12 (1992) (noting that the parties agreed that the catalog setting forth the tuition rate for the year was "primarily governed by contract principles").

the building in which his apartment was located. Crete, 150 N.H. at 674-75. The landlord's insurer paid the landlord for the insured losses and then sought to recover that amount in a subrogation action against the tenant. Id. at 674. In the insurer's appeal from dismissal for failure to state a claim, the tenant argued that there was "no basis for legal relief because, under the Sutton doctrine, a tenant is considered a coinsured of a landlord with respect to fire damage to leased residential premises," and, therefore, the landlord's insurer "has no right of subrogation against a tenant whose negligence causes fire damage."[2] Id. at 675. We found the Sutton Court's reasoning persuasive and "adopt[ed] an identical rule for residential leases in New Hampshire." Id. Specifically, joining the majority of jurisdictions, we agreed with the Sutton Court's reasoning that "'[b]asic equity and fundamental justice upon which the equitable doctrine of subrogation is established requires that when fire insurance is provided for a dwelling it protects the insurable interests of all joint owners including the possessory interests of a tenant absent an express agreement by the latter to the contrary.'" Id. (quoting Sutton, 532 P.2d at 482).

Factory Mutual argues that the Crete doctrine does not apply under the circumstances of this case and that, in any event, the parties contracted out of the doctrine through the student handbook. We first examine whether the Crete doctrine applies.

Factory Mutual asserts that it is the "possessory interest that forms the basis of a tenant's expectation to be insured under a landlord's fire insurance policy and, thus, considered a coinsured under that policy." Accordingly, its argument that the Crete doctrine does not apply rests on the contention that the plaintiffs had no possessory or other insurable interest in Morton Hall. Factory Mutual asserts that "[t]he Plaintiffs' interest, if any, is akin to that of hotel guests, which have been recognized not to have a possessory interest in the property." It argues that "[s]everal jurisdictions have recognized the distinction between a tenant and a hotel guest on the basis that a tenant 'acquires an interest in the real estate and has the exclusive possession of the leased premises, whereas the guest acquires no estate and has mere use without the actual or exclusive possession.'" (Quoting Young v. Harrison, 284 F.3d 863, 868 (8th Cir. 2002) (predicting that if South Dakota were faced with "the issue of whether a hotel guest is a tenant or something less, like a licensee," it would conclude that a hotel guest is not a tenant entitled to statutory protections, but, rather, "is subject to self-help eviction")). Similarly, Factory Mutual argues that the plaintiffs "held nothing more than a license to occupy the campus" and notes that we have held that "[a] license is a transient or impermanent interest which does not constitute an interest in land." LSP

---

[2] Anti-subrogation on the theory that the tenant is an implied coinsured of the landlord implements the principle that an insurer "cannot seek to subrogate against its own insured, even if the insured was negligent in causing the loss." Tri-Par Investments, L.L.C. v. Sousa, 680 N.W.2d 190, 194 (Neb. 2004).

Assoc. v. Town of Gilford, 142 N.H. 369, 376 (1997) (quotation omitted).  These arguments lead Factory Mutual to conclude that "Dartmouth College did not convey, and Plaintiffs did not receive, any interest in land."

We conclude that Factory Mutual's reliance on property law doctrines regarding conveyances of estates in land is misplaced.  Admittedly, the Sutton Court reasoned that "the law considers the tenant as a co-insured of the landlord absent an express agreement between them to the contrary" under a principle "derived from a recognition of a relational reality, namely, that both landlord and tenant have an insurable interest in the rented premises—the former owns the fee and the latter has a possessory interest." Sutton, 532 P.2d at 482.  It then concluded, on principles of "[b]asic equity and fundamental justice," that "when fire insurance is provided for a dwelling it protects the insurable interests of all joint owners including the possessory interests of a tenant absent an express agreement by the latter to the contrary." Id. (emphasis added).

Nevertheless, the Sutton doctrine, as it has been adopted and applied in numerous jurisdictions, has not been confined by strict property law distinctions.  As the Nebraska Supreme Court noted, "A shared insurable interest and privity between the landlord and tenant are part of the backdrop to the development of the per se rule in Sutton and similar cases, but those concepts do not form a bright line for the rule's applicability." Buckeye State Mut. Ins. Co. v. Humlicek, 822 N.W.2d 351, 357 (Neb. 2012).  The court explained:

> Lack of privity or lack of possessory interest does not preclude application of the per se rule in other jurisdictions when the fire damage is to another apartment unit in a multiunit building.  The tenant of one apartment unit never is in privity with the landlord as to the lease of another apartment.  And the tenant of one apartment does not have a possessory interest in the unit leased by another.

Id. at 357-58 (footnote omitted).

Indeed, because the Sutton doctrine is not a rule of property law, but rather, a doctrine regarding the equitable remedy of subrogation, it does not depend upon feudal principles under which "a lease was considered primarily as a conveyance of lands for a certain term or at will," and the "tenant was considered both an owner and occupier in order to provide him with the remedies with which to protect his interest against the landlord and others." Kline v. Burns, 111 N.H. 87, 90 (1971) (citations omitted).  Accordingly, even assuming that "living in a dorm and using a college campus are not enough to give a student a 'possessory' interest in the land," Koleci v.

5

<u>Sposito</u>, No. X07HHDCV166085724S, 2018 WL 2047880, at *1 (Conn. Super. Ct. Apr. 10, 2018), we do not consider that fact dispositive.

We note that in other circumstances, courts have found the relationship between a college and its residential students sufficiently similar to that of landlord and tenant to apply landlord/tenant-related doctrines despite the absence of a technical landlord/tenant relationship. For instance, in the context of deciding whether a university had a duty, akin to that of a landlord, "to use ordinary reasonable care in maintaining the common area of [a] dormitory," the Kansas Supreme Court concluded that although "the contract between [the student] and the University of Kansas was not technically a lease in the traditional sense," it was "important for the court to look at the contractual relationship of the parties in the light of modern conditions in deciding whether the common area exception is to be applied in a particular case." <u>Burch v. University of Kansas</u>, 756 P.2d 431, 432, 436 (Kan. 1988). Similarly, here, in determining whether to apply the anti-subrogation doctrine we adopted in <u>Crete</u> to a college/residential student situation, we look at the contractual relationship between the parties more broadly than whether it was "technically a lease in the traditional sense." <u>Id</u>. at 436.

As the trial court noted, each of the plaintiffs paid room and board in addition to tuition. The college provided a furnished room and utilities and the college's "Room Care and Furnishings" policy referred to a student's living space as "his/her own room." The trial court noted that the plaintiffs "could inhabit and reside in their dormitories, store their personal property inside, invite guests, make use of utilities, and decorate to their liking." The court further noted that members of the general public lack the "swipe" cards and keys required to access the dormitories, that residents could exclude other students from their rooms, and that even the college's right of entry was limited. These attributes of the college/residential student relationship support the trial court's conclusion that the plaintiffs "had a right to control their dormitories in substantially the same way a tenant has a right to control leased premises."

Factory Mutual contends that the trial court's conclusions about the plaintiffs' right to exclude others from their rooms are contrary to the record, and argues that because the plaintiffs had "no ability to exclude others from their assigned rooms or prevent Dartmouth College from transferring them to different rooms altogether, [their] occupancy is fundamentally different from that of a residential tenant." With respect to the plaintiffs' inability to exclude others, Factory Mutual asserts that: (1) according to the college's "Room Entry by College Employees" policy, employees of the college may "enter and . . . inspect any student room at any time without permission or consent of the room occupant(s)"; and (2) because the college, in its "Changing a Room Assignment" policy, reserved certain rights including "to consolidate applicants into rooms to conserve space, fill any vacancy in a partially occupied [room]

6

. . . , [and] re-designate [dormitory] room capacity as deemed necessary," students "are unable to exclude other students that are transferred into their rooms by Dartmouth College."

We are not persuaded that the limitations on the plaintiffs' ability to exclude others from their rooms renders their relationship with the college so disparate from that of landlord and tenant that the Crete doctrine should not apply. We first note that the reserved right of entry for college employees is not as broad as Factory Mutual's argument implies. College employees do not have carte blanche to enter students' dormitory rooms at any time for any, or no, reason. Rather, the policy reserves the right to enter without the occupant's permission or consent "to provide emergency service or general maintenance work, make safety or condition inspections or investigate probable violation(s) of College regulations."

Furthermore, while a student may not be able to exclude his or her college-assigned roommate from their shared room, students can exclude others, including other students of the college: the college's "Room Entry by College Employees" policy provides, "A student who enters another student room without permission is considered to be engaging in endangering behavior, and will face disciplinary action that typically results in removal from College residences." Accordingly, we find no error in the trial court's conclusion that, for purposes of applying the Crete doctrine, the plaintiffs "had a right to control and exclude others from their dormitories in a manner 'substantially identical' to that of tenants over leased property."

Similarly, other restrictions on the plaintiffs' occupancy noted by Factory Mutual do not persuade us that the Crete doctrine should not apply. Specifically, Factory Mutual notes that students are prohibited from "reassigning, transferring or subletting their assigned dormitory room to any other person or entity" and that the college retains the right to move students to different dormitory rooms. Restrictions on assignment and subletting are not uncommon in residential leases. See Roces v. Reno Housing Authority, 300 F. Supp. 3d 1172, 1181 (D. Nev. 2018) (noting that so-called "Live-In Agreement" imposed certain "use restrictions that are common in residential lease agreements, such as a restriction on assignments and subleases"). Although the ability to move students to different rooms is perhaps an attribute of the "unique relationship" between a college and its students, it does not detract from the relationship's sufficient similarity to that of landlord and tenant for purposes of the Crete doctrine. See Gamble, 136 N.H. at 12-13 (noting, in interpreting a university catalog under contract principles, that "[t]he relationship between a university and its students is distinctive, . . . and a strict doctrinal approach is inappropriate"); cf. Burch, 756 P.2d at 432, 435, 437-38 (overturning trial court's decision that was based, in part, on conclusion that a residence hall contract "fail[ed] to pass a possessory interest

7

in specific property" because it provided that "The University has the right to assign, reassign and adjust occupancy of rooms" (quotations omitted)).

For the foregoing reasons, we reject Factory Mutual's contentions that the Crete doctrine does not apply because the plaintiffs' "occupancy is fundamentally different from that of a residential tenant." Cf. Endicott College v. Mahoney, No. 00-589C, 2001 WL 1173303, at *1 (Mass. Super. Ct. Oct. 3, 2001) (noting that although "[t]he landlord-tenant relationship differs in many important respects from the college student-resident relationship[,] [w]ith respect to the issue of fire liability, . . . there are many similarities between the expectations, statutory rights, and obligations of a resident of a college dormitory and a residential tenant").

Our conclusion is buttressed by the recognition that, notwithstanding the Sutton Court's references to "joint owners," "insurable interest[s]," and "possessory interest[s]," its decision is equally — and perhaps better — grounded in the expectations of a "reasonably prudent tenant" and the equities of the case. Sutton, 532 P.2d at 482; cf. DiLullo v. Joseph, 792 A.2d 819, 822 (Conn. 2002) (agreeing with certain "criticisms of the Sutton rationale, as a matter of the general principles of insurance and contract law," but concluding that "the Sutton result is sound as a matter of subrogation law and policy"). Moreover, we did not base our decision in Crete solely on the reasoning of the Sutton decision, but also upon policy considerations noted in cases from other jurisdictions. We now consider those policy reasons in the context presented here.

We first noted in Crete that "[a] reasonable residential tenant expects that the landlord has fire insurance to protect the rental property, just as a reasonable insurance company expects to provide coverage for fire damage that may result from the actions of a tenant of the insured." Crete, 150 N.H. at 675. Similarly, as Factory Mutual concedes, a reasonable college student expects that the college has fire insurance to protect college property. Indeed, the plaintiffs point out that, in a document available on its website, Dartmouth College represents that "[t]he College insures College-owned property through an 'All-Risk' blanket policy" and that the "[p]erils covered include fire."

We further noted in Crete that "[t]he insurance company reasonably expects to pay for negligently caused fires, and takes into account that the insured property will be rented to tenants, adjusting their rates accordingly." Id. Similarly, an insurer of college dormitories reasonably expects to pay for negligently caused fires and, in setting its premiums, takes into account that the insured property will be rented to students. Id. We reach this conclusion notwithstanding Factory Mutual's assertion that, unlike a leased residence, the insured dormitory lacked cooking facilities and was subject to policies

prohibiting open flames and other "ignition sources." We conclude that a reasonable insurer would anticipate that some students will violate such policies.

Factory Mutual nevertheless continues this line of argument, asserting that "[e]ven if violations of these policies were foreseeable, Factory Mutual knew that the sanctions set out in those policies, including full restitution of damages, could be imposed." For Factory Mutual to rely on the sanctions set out in Dartmouth College's policies, however, it would have to be able to enforce those sanctions as subrogee of the college. As the instant action demonstrates, that ability was far from certain when Factory Mutual set the premium for the policy at issue. We are, therefore, unpersuaded that a reasonable insurer in Factory Mutual's position would not adjust its rates to account for the risk that a student would negligently cause a fire for which it would be unable to obtain restitution of damages.

An additional consideration we noted in <u>Crete</u> is "it is likely that the tenant pays a portion of the insurance policy's premium through the rent." <u>Id</u>. Similarly, it is likely that college students pay a portion of the insurance policy's premium through tuition and/or room and board fees. Factory Mutual again concedes that "student payments for tuition, fees, and housing may, albeit minimally, contribute to payment for Dartmouth College's insurance policies," but discounts the significance of such payments. It asserts that because "expenses of a residential landlord relate <u>only</u> to the leasing and maintenance of" the leased property, "a residential tenant's rent directly contributes to the landlord obtaining fire insurance coverage." By contrast, Factory Mutual argues, "there are a myriad of expenses unrelated to housing for which students' tuition and fees help pay, including, among others, the salaries of faculty, administrators and staff; maintenance of academic and athletic buildings; operation of dining halls; advertisement to prospective students; [and] operation and maintenance of libraries and research centers."

We are not persuaded. The number and variety of expenses the insured — be it a residential landlord or a college — pays, and, indeed, the number and variety of its sources of income, are immaterial. The expectation of a reasonable college student is that his or her tuition and other payments to the college contribute to an amorphous "pot of money" out of which all of the college's expenses, including fire insurance, are paid. <u>Cf</u>. <u>Endicott College</u>, 2001 WL 1173303, at *3-4 (noting college's admission that it did not exclude student's tuition from its fire insurance premium payments, and concluding, in any event, that "[w]hether or not [the student] actually contributed to the premiums . . . is not as important as his reasonable expectations"). As previously noted, Factory Mutual concedes as much, and we conclude that this is enough to allow a student in the plaintiffs' position to reasonably expect that the fire insurance policy toward which he or she pays, whether directly or indirectly, also inures to his or her benefit.

9

The final policy consideration noted in Crete is that "if the Sutton doctrine is rejected, tenants are placed in the untenable position of having to carry fire insurance for the entire building in which they rent, regardless of the extent of their possessory interest or lack of knowledge necessary to procure adequate coverage." Crete, 150 N.H. at 675. "In such a situation, there would be multiple insurance policies covering the same building, resulting in economic waste." Id. The same concern applies here.

Ro represents that "[m]ore than 3,000 undergraduates live in campus residence halls" at Dartmouth College. If each student resident were to obtain insurance on the building in which he or she resides, Dartmouth College's dormitories would be vastly overinsured. Cf. DiLullo, 792 A.2d at 822–23 (noting that if each tenant procured insurance on the landlord's building, "[t]his duplication of insurance would, in our view, constitute economic waste and, in a multiunit building, the waste would be compounded by the number of tenants"). For the foregoing reasons, we conclude that all of the policy considerations we relied on in Crete apply with equal force here.

In sum, we conclude that, even if the plaintiffs lacked a possessory interest in their dormitories, and even if their relationship with the college was not strictly that of landlord and tenant, they had a contractual relationship with the college in which they paid for the right, subject to the noted limitations, among others, to occupy a college dormitory for a certain period of time. This contractual relationship gave rise to the reasonable expectation that Dartmouth College carried fire insurance on its dormitories, that the plaintiffs' room and board fees contributed, in some way, to the premium for that insurance, and, therefore, that the insurance inured to their benefit or, in other words, that they would be treated as implied coinsureds under the Crete anti-subrogation doctrine. See Endicott College, 2001 WL 1173303, at *4 (concluding that a residential college student, "like a tenant, had a reasonable expectation that [the college's] insurance policy would inure to his benefit as a result of his contractual relationship with [the college]"). Accordingly, we reject Factory Mutual's contention that the Crete doctrine does not apply under the circumstances of this case.

To the extent Factory Mutual challenges the applicability of the Crete doctrine specifically as to Ro on the basis that he did not reside in Morton Hall, but, rather, lived in a different dormitory on campus, we reject that contention. The trial court found Ro's position "analogous to that of a tenant who rents one unit in a residential complex but causes fire damage to another unit in the complex." We agree.

In Crete, it was implied, though not explicitly stated, that the fire originating in the tenant's apartment caused damage outside that apartment. See Crete, 150 N.H. at 674 (noting that the "fire caused extensive damage to

10

the building" in which Crete leased his apartment).  In addition, we implicitly considered the <u>Sutton</u> doctrine to be applicable when damage to the insured property extends beyond the leased premises.  <u>See</u> <u>id</u>. (reasoning that "if the <u>Sutton</u> doctrine is rejected, tenants are placed in the untenable position of having to carry fire insurance for the entire building in which they rent, regardless of the extent of their possessory interest or lack of knowledge necessary to procure adequate coverage").  Other courts have explicitly held that a tenant is an implied coinsured with respect to such damage.  <u>See, e.g.</u>, <u>Buckeye State Mut. Ins. Co.</u>, 822 N.W.2d at 355, 357 (concluding that the <u>Sutton</u> doctrine "applies to bar subrogation against a duplex tenant as to both sides of the building").  We now join those courts so holding.  We also agree with the trial court that Ro's position with respect to Morton Hall is analogous to such a tenant, and we reject Factory Mutual's attempt to treat Ro and Lim differently under the <u>Crete</u> doctrine.

Factory Mutual next argues that, through various policies contained in the student handbook, the parties contracted to negate the <u>Crete</u> doctrine.  The plaintiffs, on the other hand, argue that the policies cited by Factory Mutual are insufficient because, as Ro argues, they "do not inform students that they are expected to procure property insurance coverage for either fire or water damage to the buildings they occupied."  Factory Mutual counters that the plaintiffs' contention that an agreement must "specifically address the issue of insurance" to negate the anti-subrogation doctrine "is a narrow application of <u>Crete</u> that is neither supported by the <u>Sutton</u> decision, nor this Court's application of the <u>Sutton</u> decision."

In arguing their respective positions, the parties cite different portions of our decision in <u>Crete</u>.  The first relevant passage states:

> It is permissible under the <u>Sutton</u> doctrine . . . for a landlord and tenant to enter into an express agreement or lease provision that would place responsibility for fire damage upon the tenant.  For example, a rental agreement could require the tenant to carry fire insurance to insure against the tenant's own negligence, or specify that the landlord's insurance would not cover the tenant in the event of a fire caused by the tenant's negligence.  Absent an express agreement in a residential lease that places liability upon the tenant for the tenant's own negligence in causing a fire, however, the tenant is considered a coinsured and is not obligated to subrogate the landlord's insurer.

<u>Crete</u>, 150 N.H. at 676.

Factory Mutual focuses on the references to an express agreement or lease provision "that would place <u>responsibility for fire damage</u> upon the tenant" or "that places <u>liability upon the tenant for the tenant's own negligence</u>

in causing a fire," id. (emphases added), and asserts that the examples mentioned in Crete — requiring the tenant to procure fire insurance or stating that the landlord's policy does not cover the tenant — are not the exclusive means of contractually negating the anti-subrogation doctrine. Factory Mutual contends that the agreement in Crete was found inadequate because it did "not address the specific issue of the tenant's liability for fire damages caused by the tenant's negligence." Id. (emphases added). Instead, that agreement contained only general language providing that the tenant was "responsible and liable for all repairs, replacements, and damages caused by or required as a result of any acts or neglect of the Tenant, Occupants, invitees or guests." Id. (quotation omitted).

Factory Mutual argues that, in contrast to the general language found inadequate in Crete, Dartmouth College's "Open Flame in Residence Halls" policy explicitly prohibited the "burning of candles, incense, or any other item with an open flame . . . in residence halls" and provided that "violations may result in . . . assessment of the cost of any repairs associated with damage caused by the open flame." (Emphasis added.) Accordingly, Factory Mutual contends, this language is sufficient, under Crete, to negate the anti-subrogation rule.

Lim, on the other hand, cites our observation that the inadequate lease provision in Crete neither "explicitly state[d] that the tenant is not considered a coinsured of the landlord" nor "explicitly require[d] the tenant to obtain his or her own fire insurance for the leased premises." Id. He argues:

> Thus, under Crete, it is not enough for the agreement to state that the tenant, or in the present instance the student, is responsible for damages caused by negligence including fire damage. The agreement must expressly address the consequence of the Sutton doctrine itself, that the tenant is expressly not considered to be a co-insured and may be subject to subrogation for a negligently caused fire, or specifically state that the tenant must obtain fire insurance for the structure.

Ro similarly contends that "[t]he lack of any reference to the need to procure insurance coverage is dispositive under Crete."

As the foregoing indicates, each of the parties' respective arguments finds some support in the language of Crete. Accordingly, we now clarify that language. In doing so, we agree with Ro that our statements in Crete regarding the tenant's liability for fire damage "must be read in the context of the entire decision which was based on the [Sutton] doctrine allocation of risk through insurance coverage." Specifically, both plaintiffs contend that the Sutton doctrine was based on allocation of the obligation to insure, not allocation of liability for damage. We agree.

In suggesting that the parties could negate the anti-subrogation doctrine by express agreement, the Sutton Court stated: "The landlords of course could have held out for an agreement that the tenant would furnish fire insurance on the premises.  But they did not.  They elected to themselves purchase the coverage."  Sutton, 532 P.2d at 482.  The court then examined the expectations of a "reasonably prudent tenant" as to which party would normally be expected to insure the building in the absence of such an agreement.  Id.  It determined that, unless the landlord expressly required the tenant to obtain fire insurance on the building, the tenant could reasonably presume that the landlord had procured such a policy and that the policy inured to his or her benefit.  See id.

In light of the foregoing, we agree with the plaintiffs that an agreement to negate the anti-subrogation doctrine we adopted in Crete must explicitly address the issue of insurance.  We note that some jurisdictions applying the Sutton doctrine have required that, for an agreement to negate the anti-subrogation doctrine, it "must expressly require the tenant to obtain fire insurance on the realty," Beveridge v. Savage, 830 N.W.2d 482, 487 (Neb. 2013), or "put [the] tenant on notice that the landlord's insurer has a right of subrogation for any loss benefits paid," Middlesex Mut. Assur. Co. v. Vaszil, 900 A.2d 513, 519 (Conn. 2006).  A provision imposing responsibility for fire loss, by itself, is not sufficient to negate Crete's anti-subrogation doctrine.  See id. at 516 (lease provisions "obligating the tenant to refrain from causing damage to the apartment and to repair such damage did not create an express agreement obligating the tenant to the landlord's insurer for the fire loss" (quotation omitted)); see also Dattel Family Ltd. Partnership v. Wintz, 250 S.W.3d 883, 886-87, 894 (Tenn. Ct. App. 2007); Cascade Trailer Court v. Beeson, 749 P.2d 761, 766 (Wash. Ct. App. 1988).  We now clarify that our language in Crete regarding placing "responsibility" or "liability" for fire loss on the tenant, read in the context of its surrounding language and the Sutton opinion that influenced our decision, meant explicitly informing the tenant either of his or her responsibility to insure for fire loss or of his or her potential liability to the landlord's insurer in a subrogation action.

Factory Mutual asserts that various college policies contained in the student handbook constitute an express agreement that negates anti-subrogation under Crete.  None of the policies, however, explicitly required the plaintiffs to purchase fire insurance on their respective dormitories or informed them that they could be liable on a subrogation claim by the college's insurer if they negligently caused a fire.  Rather, as the plaintiffs assert, the treatment of the subject of insurance in the student handbook and other college documents reinforced a reasonable expectation that the responsibility to insure dormitory buildings was allocated to Dartmouth College.

As previously noted, a document available on Dartmouth College's website represents that the college insures the property it owns against perils

13

including fire.[3]  Other courts have concluded that language in a rental agreement indicating that the landlord has insured the property could support a tenant's reasonable expectation that the tenant was not required to do so. See Middlesex Mut. Assur. Co., 900 A.2d at 518-19 (lease provision "impl[ying] that the landlord has procured casualty and property insurance . . . suggests that only the landlord is expected to carry insurance" and, therefore, "not only fails to put a tenant on notice that the landlord's insurer has a right of subrogation for any loss benefits paid, it also neglects to put a tenant on notice that he or she should obtain insurance coverage for a catastrophic loss"); see also Sutton, 532 P.2d at 482.  That expectation and its reasonableness are strengthened when the rental agreement cautions that the tenant's personal property is not covered by the landlord's insurance and/or explicitly allocates the burden of insuring personal property to the tenant.  Where lease provisions,

> [t]aken as a whole, [imply that] the landlord will carry general fire and hazard insurance for the protection of the building and property not owned by or personal to the tenant[,] . . . the landlord has assumed the risk of fire to the realty, while the tenants have assumed the risk to . . . [their] property.  The respective benefits confirm such an allocation of risk.  Each party undertakes to protect its own property to the mutual benefit of the other, that is, by not expecting the other to bear the liability or cost of carrying duplicative coverage.

Lexington Ins. Co. v. Raboin, 712 A.2d 1011, 1014 (Del. Super. Ct.), aff'd, 723 A.2d 397 (Del. 1998); see also Peterson v. Silva, 704 N.E.2d 1163, 1165 (Mass. 1999); Dattel Family Ltd. Partnership, 250 S.W.3d at 886.

Here, the document available on the website representing that the college carries an all-risk blanket policy on its property cautions:

> It is important to understand that the College's fire, crime, equipment floater and data processing insurance policies protect only College-owned property.  The personal property of students,

---

[3] Factory Mutual argues that "the webpage cited by the Plaintiffs is not a policy of Dartmouth College and not contained within the Student Handbook.  The page is for informational purposes only[,] . . . does not contain terms of the agreement between the Plaintiffs and Dartmouth College . . . [and] does not alter the agreement between the Plaintiffs and Dartmouth College."  We reiterate, however, that the "relationship between a [college] and its students is distinctive, . . .  and a strict doctrinal approach is inappropriate."  Gamble, 136 N.H. at 12-13.  We believe that the college's representations on its website may be considered in determining what a student's reasonable expectations about procuring insurance would be.  In any event, as noted below, the college's Damage and Vandalism policy contains information about the allocation of insurance burdens between the college and its students that would reinforce a reasonable student's expectation that students were not required to obtain insurance coverage for their dormitory buildings.

faculty and staff in College buildings is not covered under the College insurance programs.  It is strongly recommended that individuals who have their own personal property (including art, rugs, books, computers, etc[.]) in their offices, studios, labs, dorm rooms, etc., purchase their own insurance to cover these items, or assume the risks which are inherent.

The college's Damage and Vandalism policy also advises students that the college does not "carry insurance for the loss of personal property within any of its residences due to vandalism, theft, fire, wind, flood, accidents, or other catastrophes" and that "[r]esidents of College housing are expected to provide adequate insurance coverage for all personal property."  We agree with Lim that "[t]his allocation of the burden of obtaining fire insurance on the building itself is precisely the opposite of what . . . Crete . . . require[s] to defeat the presumption of co-insurance."  Cf. Endicott College, 2001 WL 1173303, at *3 ("The absence of a requirement [in the college's residency and board agreement] to obtain fire insurance accompanied by an explicit recommendation . . . [that students obtain] personal property insurance, coupled with the overly broad general liability clauses, create a reasonable expectation on the part of students of non-liability for fire damage.").

Factory Mutual next argues that principles of equity necessitate holding the plaintiffs financially responsible for the damage they caused.  Specifically, it notes that "the purpose of subrogation is to place the responsibility where it ultimately should rest by compelling payment by the one who in good conscience ought to pay it," Security Fence Co. v. Association, 101 N.H. 190, 192 (1957) (quotation omitted), and argues that "[r]esponsibility for the Morton Hall fire properly rests upon the Plaintiffs due to their violations of several Dartmouth College policies that provide for recovery of costs of repair."  We disagree.

"The doctrine of subrogation has its origins in equity," Wolters v. Am. Republic Ins. Co., 149 N.H. 599, 601 (2003), and, accordingly, determining whether subrogation will be allowed requires balancing the equities, see Security Fence Co., 101 N.H. at 192.  Here, the plaintiffs negligently started the fire that damaged Morton Hall.  Factory Mutual, however, accepted premiums to insure against the risk of negligently-caused fire.  We agree with Ro that, "having elected to undertake the risk and through its acceptance of substantial premiums, Factory Mutual cannot reasonably take the position that it is inequitable for it to bear the loss."

We are not the only court to employ this reasoning in applying the Sutton anti-subrogation doctrine.  As the Nebraska Supreme Court explained:

[W]hether the insurer could subrogate [does] not necessarily depend on categorizing the legal relationship of the wrongdoer to

15

the named insured. Nor [does] it depend on whether the homeowner could sue the wrongdoer for negligent destruction of the property. The question [is] instead whether, under all the circumstances, recovery by the insurer against the wrongdoer would be "in effect" recovery from the insured for the very risk that the insurer agreed to take upon payment of the premium.

. . . .

In the end, [the plaintiff insurer] can only be granted the right to subrogation where necessary to subserve the ends of justice and do equity. Such ends are not present when the insurer is attempting to recoup payments for the very risk purchased by the insured.

Buckeye State Mut. Ins. Co., 822 N.W.2d at 354-55, 359 (footnotes omitted). We similarly conclude that the balance of equities here does not favor subrogation.

Factory Mutual urges the contrary view expressed in Phoenix Insurance Co. v. Stamell, 796 N.Y.S.2d 772 (App. Div. 2005), a case addressing, as an issue of first impression in New York, "whether a college's fire insurer may recover damages from a student for his or her negligent acts that led to a fire causing property damage to the college." Stamell, 796 N.Y.S.2d at 773. We decline to follow Stamell's balancing of the equities. We note that the Stamell Court declined to adopt the Sutton doctrine, see id. at 776, 778-79, and we, therefore, find the case of little value in deciding whether to extend the holding of Crete, which did adopt that doctrine, to the facts of the instant case.

We also reject Factory Mutual's assertion that the balance of equities tips in its favor because the plaintiffs violated college policies. As previously stated, Factory Mutual knew that it was insuring a college dormitory and presumably adjusted its rates to account for the risk that a student might violate college policies and negligently start a fire.

For all of the foregoing reasons, we affirm the decision of the trial court.

Affirmed.

HANTZ MARCONI and DONOVAN, JJ., concurred.

16